278 So.2d 795 (1973)
Mark E. HALL
v.
HARTFORD ACCIDENT & INDEMNITY CO. et al.
No. 5156.
Court of Appeal of Louisiana, Fourth Circuit.
May 1, 1973.
Rehearing Denied June 7, 1973.
Writ Refused August 31, 1973.
*796 Calogero & Kronlage, Charles Kronlage, Jr., New Orleans, for plaintiff-appellee.
Porteous, Toledano, Hainkel & Johnson, James L. Donovan, New Orleans, for Third Party defendant & appellants.
Drury, Lozes & Curry, Felicien P. Lozes, New Orleans, for intervenor-appellant.
Before REDMANN, LEMMON and BAILES, JJ.
LEMMON, Judge.
Plaintiff, an employee of Valiant Manufacturing Corporation, a lightweight motorcycle manufacturer, was injured in an industrial accident at his employer's plant. In this suit he sought recovery of his damages against Allstate Insurance Company, as insurer of Valiant's executives; Hawk Tool and Engineering Company, from whom Valiant bought some of the motorcycle parts; and Hartford Accident and Indemnity Company, Hawk's insurer. The jury verdict and judgment in favor of plaintiff and against Allstate dismissed the other defendants. Allstate appealed, raising only the issue of liability. The amount of the award is not in dispute, although related questions involving the intervention of the workmen's compensation insurer and the effect of a compromise settlement on Allstate's contribution claim will be discussed separately.
Plaintiff's duties included assembling the motorcycle wheel, about 12 inches in diameter, and mounting the tire on the wheel assembly. Valiant purchased the wheel components, consisting of two discs pressed from 16-gauge steel, from Hawk. In preparing the discs for assembly, Valiant had six ¼-inch holes drilled in each disc. To assemble the wheel, plaintiff was instructed to place one disc flat on the work bench and to fit six ¼-inch bolts into the holes drilled in the disc; then to place the tire (with tube inside) on the rim and to place the other disc on the tire in contact with the bottom disc; then to place an internal tooth lock washer and a nut on each of the protruding bolts and to screw down tightly.
Plaintiff was further instructed to inflate the tire to a pressure of 40 to 45 p.s.i. in order to properly seat the tire, although the recommended pressure for actual use was 15 p.s.i. In inflating the tire, plaintiff was required to utilize air from an inflating station set to deliver a maximum pressure of 100 p.s.i. This inflating station served no other function in the plant.
An inflating gauge on the air supply hose served both to inflate the tire and to check the internal air pressure. In order to inflate the tire, plaintiff had to hold the nozzle to the valve stem with one hand and to depress a button on the gauge housing with the other hand. Only when the button was released did the gauge register the internal air pressure.
Plaintiff had been employed by Valiant less than one month when the accident occurred. While he was seating a tire by inflating it, the assembly separated violently and a metal disc struck plaintiff in the head. Subsequent investigation determined that the discs had separated because the nuts had been pulled through the metal disc at all six connections. The bolts themselves did not break.
Obviously, the wheel in question separated at a pressure of no more than 100 p.s.i. Tests performed on similar assemblies obtained *797 from Valiant yielded the following results:
1. a wheel assembled in the same manner separated at 98 p.s.i.[1];
2. a wheel assembled with a flat washer separated at 135 p.s.i., at which pressure all six bolts broke;
3. a welded assembly broke at 160 p.s.i. when the rim buckled.
A physicist offered expert testimony that when the six bolts were drilled and countersunk, the removal of some metal decreased the bearing ability of the metallic surface. Stating that a joint should be designed to develop maximum strength, he observed that a designed joint has not developed maximum strength if the bolts pull through upon rupture, as occurred in this case. Breaking of the bolts would have indicated that the joint had developed maximum strength.
The expert emphasized the dangerous propensities of pneumatic pressure developed by compressed air and stated that industrial safety standards require that the ultimate strength of an assembly under pneumatic pressure be designed much higher than the expected stress. Noting that high factors of safety are required with pneumatic pressure, complicated stresses or in situations where serious injuries might result from failure, he opined that failure mechanism was inherent in the design of the subject assembly.
The physicist observed that safety to the operator could have been obtained (1) by use of flat washers; or (2) by use of more bolts to strengthen the assembly; or (3) by welding the assembly; or (4) by restraining the tire; or (5) by simply lowering the pressure available from the station, which would have corrected the most flagrant safety violation in the procedure. Since a pressure of 45 p.s.i. was anticipated, either the assembly should have been designed to withstand much greater pressures, or the pressure available from the compressor should have been much less than the failure point of the assembly.
Valiant's chief executive officer was J. P. Treen, who had also held the same position for Simplex Manufacturing Corporation, Valiant's predecessor. Simplex had been a larger firm and had employed several engineers. However, during Simplex's existence, Treen had performed some of the design work and in his executive capacity had approved all designs.[2] When Valiant was formed, the smaller company employed no engineers, but with Treen's approval and under his direction continued to use the wheel assembly design previously used by Simplex.
As to that design, Treen opined that safety factors should be geared to the greatest load the assembly would encounter in normal use, rather than in a collision or overinflation situation. Although he was not familiar with recommended safety factors for assemblies under pneumatic pressure, he assumed that an employee would never overinflate a tire by more than five or ten pounds and thus saw no need for an assembly designed to withstand greater pressures, despite the fact that the air supply he obliged his employees to use delivered a much greater pressure.
We believe that it was negligent for Treen to subject his employees to the unnecessary danger of inflating a tire to 45 p.s.i. on a wheel assembly designed with a failure point of 90 p.s.i., when the inflating station used solely for that purpose delivered pressure in excess of 90 p.s.i. By providing an inadequately designed assembly, the ultimate strength of which was extremely low in proportion to the anticipated *798 stress, and by requiring plaintiff and other employees to use an inflating station set to deliver pressure in excess of the ultimate strength of the assembly, Valiant in general and Treen in particular created a situation fraught with danger. See Chaney v. Brupbacher, 242 So.2d 627 (La.App. 4th Cir. 1970). Since it was entirely unnecessary to do so in view of the nature of the operation, and since safety could have been attained simply and inexpensively, Treen owed a duty to the employees under his supervision to remedy this dangerous design and procedural method, and he breached his duty to this employee by instructing and requiring him to work in this unsafe situation.

CONTRIBUTORY NEGLIENCE
Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own safety and protection, the standard being that of a reasonable man under like circumstances. Smolinski v. Taulli, La., 276 So.2d 286 (1973).
Allstate contends plaintiff was contributorily negligent in that he continued to inflate the tire after the time the internal pressure reached 45 p.s.i. and until the time the assembly ruptured at approximately 90 p.s.i., when he could have protected himself by simply releasing the button and checking the gauge periodically. In essence, Allstate contends there was a margin of safety within which plaintiff could have performed his duties without endangering himself.
While a margin did exist between the pressure required to seat the tire and the pressure at which the assembly separated, uncontradicted evidence established that the margin was not a safe one. Even if we disregard the obvious ease with which Allstate's insured could have eliminated the need for a margin of safety by regulating the compressor, the margin of safety allowed for plaintiff to perform his duties raises an issue of degree.
Expert testimony established that the provision for adequate safety factors is a significant consideration in the design of an assembly; that for handling small tires, provision should be made to either control the pressure or to restrain the tire; that the ultimate strength of the assembly should be designed much higher than the expected load; and that there should be a safety factor of at least four to one in a case like the present one. While one reason for this high safety factor was that the assembly had not been destructively tested to measure the actual strength, the primary reasons were the use of pneumatic pressure and the possibility of injury.
From the standpoint of danger to the operator, the safety factor in this case was not adequate, the breaking point pressure being only double the anticipated pressure. While regulation of the pressure supply (the other important factor in the accident) was definitely not within plaintiff's control, the inflation pressure was to some extent within his control. The extent of that control is an important consideration in the issue of contributory negligence.
One expert severely criticized the gauge by which an operator must control the inflation of the tire. The gauge did not indicate the internal pressure at all times, but only when the handle was released. While the tire was being inflated, which was the time knowledge of the pressure was critical, the gauge did not indicate a pressure reading.
In considering negligence and contributory negligence in a given situation, a court does not necessarily demand identical conduct of the plaintiff and the defendant. Prosser, Handbook of The Law of Torts, Ch. 11, p. 419 (4th ed. 1971). Varying factors affect what the standard of the reasonable man requires. For example, the defendant may have more information than *799 the plaintiff as to the risk involved or by reason of the particular enterprise may be required to obtain this information. Prosser, supra. These factors must be considered in measuring the reasonableness of each party's conduct.
The assembling, inflating and mounting of tires was in constant process at Valiant's plant which Treen superintended. Treen created the risk and maintained the unsafe situation; he knew or should have known of the deficient design, the danger incident thereto when using unnecessarily high air pressure, and the ease of correcting the deficiency and eliminating the danger.
On the other hand, plaintiff had nothing whatsoever to do either with designing the deficient assembly or with creating and maintaining the dangerous inflation procedure. He had no reason to know that the assembly was unsafely designed or that the pressure at the compressor was not safely controlled. He did not supply the inadequate gauge. It was not within his province to provide a method of restraining the tire during inflation. He simply used the materials and equipment supplied to him and followed the procedure outlined to him. His only causal relationship to the accident was that he momentarily continued to depress the button after the anticipated pressure was attained, although there was no instrument on the equipment supplied to him to indicate that the desired pressure had been reached.
One of the purposes of establishing industrial safety factors is to impose a standard of care upon the party who knows or should know of the dangers of various manufacturing methods and procedures and who is in the best position to eliminate these dangers. When the party charged with the responsibility of observing safety factors fails to do so, it is grossly unjust to place the blame for a resulting accident on the person who poured the last cup of water before the defective dam broke, unless that person also exercises a substantial amount of knowledgeable control over the dangerous situation. There was no such knowledge or control by plaintiff in the present case. We conclude that plaintiff's conduct was reasonable under the circumstances known to him, while the conduct of Allstate's insured was not in consideration of the circumstances which were known (or should have been known) by him.

REDUCTION OF AWARD
While Allstate does not contest the amount of the jury award, it contends that the award should be reduced by one-half, inasmuch as plaintiff's compromise with the co-defendant (after submission of the case but before the jury verdict) deprived Allstate of its right to contribution from the co-defendant. In this regard Allstate relies on Harvey v. Travelers Ins. Co., 163 So.2d 916 (La.App.3rd Cir. 1964).
When a plaintiff releases one of two joint tort-feasors, the unreleased joint tort-feasor is effectively deprived of the right to contribution. Recognizing this, the court in Harvey decreed that the plaintiff in that situation is only entitled to recover one-half of his damages from the unreleased tort-feasor. However, this reduction in recovery does not apply to all situations in which multiple defendants are alleged to be liable, but only applies to cases in which more than one defendant would actually be liable for the damages except for the compromise.
Allstate's position is directly contrary to the following unambiguous language in the Harvey case:
"* * * If it should be determined on the trial of the merits of this case that the driver of the Downs car and the driver of the Davidson truck were both negligent, and thus that they were joint tort-feasors, then in view of the settlement with and release of the driver of *800 the Downs car (and his insurer) plaintiffs must be decreed to have reduced their claim by one-half, and they would be permitted to recover only one-half of the total amount of their damages from the remaining tort-feasor, Davidson (and its insurer). If it should be determined on a trial of the merits that the driver of the Downs car was not negligent, and thus that he was not a joint tort-feasor, then the settlement entered into between plaintiffs and Downs would not have the effect of reducing plaintiffs' claim against any others who may be determined to be tort-feasors." p. 922 (Emphasis supplied)
In the present case it was determined by the jury (unaware of the compromise) that the released co-defendant was not a joint tort-feasor. Inasmuch as we find no manifest error in this factual determination we conclude that Allstate is not entitled to a reduction in damages.

INTERVENTION OF COMPENSATION INSURER
The trial court judgment awarded Hall's workmen's compensation insurer the amount of all benefits paid through the date of trial, to be deducted from the amount of plaintiff's judgment. The insurer appealed, asserting that it should have been allowed a continuing credit, since it continued to pay benefits after completion of the trial and during the course of this appeal.
A compensation insurer intervening in an action by the employee against a third party is entitled to reimbursement of all benefits paid to the employee, including those paid subsequent to the date of trial. R.S. 23:1103; Barrois v. Service Drayage Co., 250 So.2d 135 (La.App. 4th Cir. 1971). We accordingly amend the judgment to grant the intervening insurer reimbursement for all amounts paid as workmen's compensation benefits, including those paid subsequent to the date of the judgment of the trial court.
As amended, the judgment is affirmed.
Amended and affirmed.
BAILES, J., dissents with written reasons.
BAILES, Judge (dissenting).
Allstate Insurance Company, defendant, pleads that the accident in which plaintiff was injured was caused by his own negligence in: (1) failing to use ordinary care and caution while inflating air in the wheel assembly; (2) failing to use normal precautions in a situation of this nature; (3) overinflating a wheel assembly; (4) failing to properly read air gauge while inflating wheel assembly; and (5) assuming the risk. Alternatively, defendant pleads, in the event the defendant's insureds are found to be negligent, which is denied, contributory negligence of the plaintiff in the particulars as enumerated above.
Valiant Manufacturing Company, wholly owned by Mr. Paul Treen, is the successor to the Simplex Manufacturing Corporation which became insolvent in 1964. It had been in business for many years prior to its insolvency. Mr. Treen was an officer of Simplex which among other operations manufactured a motorcycle bearing the same name. When Simplex ceased its function, Valiant, as Simplex had done, continued to purchase wheel components from Hawke. Hawke, too, was a former manufacturer of motorcycles. These wheel components consisted of two discs pressed or stamped from 16 ga. steel. In preparing the disc for assembly, Valiant drilled each disc with six one-quarter inch holes through which, in assembling procedure, one-quarter inch bolts are fitted on one side of one disc and on the protruding bolts a lock washer and nut are placed and screwed down tight on the disc fitted on the opposite side of the wheel.
*801 There is testimony in the record that in the drilling of the six one-quarter inch holes, burrs occur which were removed by a tool that also removed a small part of the metal around the drilled hole. The record is not clear as to how much metal was removed in this operation, nor does the record disclose how this would materially weaken the assembly.
In the assembling of the wheel and the mounting of the tire the procedure approved by Mr. Treen and in which the plaintiff was instructed was as follows: One wheel disc is placed flat on the work bench, the tire with tube inserted is placed on the rim and the other disc is placed on the tire and in contact with the bottom disc. Then the six one-quarter inch bolts, lock washers and nuts are fitted as outlined above. For the purpose of properly seating the tire on the rim, the tire is inflated to a maximum pressure or 40 to 45 psi. The functional tire pressure recommended by the manufacturer is 15 psi. For each motorcycle three wheels are assembled, of which two are fitted on the motorcycle (with each tire inflated to 15 psi) and the third, a spare wheel, is inflated to 30 psi.
In the shop for the purpose of inflating the tires an air compressor with a maximum air pressure of 100 psi is maintained. The service hose from the air compressor is fitted with a Milton Gauge. This gauge serves the dual purpose of both inflating the tires and of verifying internal air pressure. This gauge is so constructed that to induce air the nozzle attached to the end of a 15 inch hose extending from the gauge housing is fitted to the valve stem of the inner tube and a small button about the size of a dime is depressed. The operation of the gauge is a simple two handed procedure. The operation obviously may be performed by holding the bib nozzle of the hose on the valve stem with one hand and grasping the gauge housing with the other hand and depressing and releasing the inlet valve button with the index finger. To check the pressure the nozzle remains fixed to the valve stem and the air button is released whereupon a cylindrical graduated indicator which can be seen beneath a sight glass instantly registers the internal air pressure. When the finger is removed from the valve button, induction of air into the inner tube ceases. The Milton gauge used by the plaintiff was found, on testing by Shilstone Laboratories to be accurate. So, with the gauge hose attached as described above, the procedure to follow in inflating and checking air pressure with the Milton gauge is to press the button with one finger to inflate and on removing the finger from the button, the gauge automatically registers internal air pressure. It is absolutely that simple.
Succinctly stated, plaintiff's case is formulated and based on evidence presented through experts that the wheel assembly would violently dismember and fly apart under procedures used by Valiant and dictated by Mr. Treen when subjected to an internal air pressure or 98 psi, and that the procedure lacked sufficiently designed safety factors to assure safe assembly under the work practices and existing shop facilities, and that it was these deficiencies which caused the accident and resulting injuries to plaintiff.
Both disinterested testing experts, Mr. Bryan of Shilstone Laboratories, and Dr. Robert, of Gulf South Research Institute, attributed the cause of the rupture of the wheel to excessive inflation of the tire. Plaintiff does not contend otherwise, however, he seeks to fix blame for his injuries on the lack of an air system that would prevent or interdict air pressure sufficient to explode the wheel, and the absence of a design to withstand an internal tire pressure of four times the maximum pressure to which the tire is expected to be inflated.
Plaintiff argues, with citation of authority, that there is a presumption of law that *802 he exercised proper care for his own safety. This presumption to which plaintiff refers does not exist where, as herein, there is positive proof that plaintiff did not exercise proper care. The plaintiff's own proof refutes his premise. One expert found the wheel would explode at 98 psi air pressure, and another expert found the wheel, under different circumstances, that, the use of flat washers under the head of the bolts and under the nuts, would explode at 135 psi air pressure, and that if the two segments were welded, the tire would deform the rim and explode at 160 psi air pressure.
Mr. Treen testified that Valiant workmen yearly inflate approximately 10,000 tires and that Valiant and its predecessor, Simplex, during 35 years of operation, never had a wheel to dismember. This same assembly procedure has been in operation during this period of time with this same type wheel.
The majority defines contributory negligence as conduct on the part of the plaintiff which falls below the standard to which he should conform for his own safety and protection, the standard being that of a reasonable man under like circumstances.
I accept this as a fair definition of negligence and when this definition is reasonably applied to the facts of this case, facts which are plain in the record and completely ignored by the majority, there is no legal escape from the conclusion that plaintiff's recovery is barred by his own negligent conduct.
The plaintiff testified that his instructions were to inflate the tires to 40 pounds, and that on two previous occasions he exceeded this pressure. Whereupon he was severely rebuked for the violation of instructions. This alone should have been sufficient to impress plaintiff that the instructions were to be followed.
The majority approvingly relies on Chaney v. Brupbacher, 242 So.2d 627 (1970), a split decision of this court authored by a member of the majority herein. I must reject the application of sociological reasoning for spurning and avoiding facts which obviously and conclusively establish negligence on the part of the plaintiff. See the paragraph in Chaney v. Brupbacher, supra, on page 632, commencing with the sentence and discussing, "The test for negligence is reasonableness."
The proof is clear that this unfortunate accident and the serious and permanent injuries resulting therefrom were caused solely and proximately by the careless and negligent inattention of plaintiff to his instructed duties in assembling the wheels. Without his disregard of instructions, as well as disregard for his own safety, or stated another way, if he had been mindful of his duties and followed the positive instructions, the accident would not have occurred. In the performance of his job duties, as per instructions, it was within his power to have prevented the accident. Given the shop facilities as they existed, and given the wheel assembly with the assumption that it had all the contended for deficiencies inherent therein, the accident would not have occurred if plaintiff had checked the pressure at reasonable intervals during inflation. As explained above, by merely removing one finger from the air valve button, the internal tire pressure would have registered on the graduated cylindrical indicator under the sight glass. Assuming that the wheel as assembled possessed weakness, such weakness is the remote cause of the accident.
This negligence of the plaintiff is the efficient, predominant and overriding cause of the accident. It was this cause which set in motion the other and remote causes. See Harvey v. Great American Indemnity Company, La.App., 110 So.2d 595 (1959); Dixie Drive It Yourself System v. American *803 Beverage Co., 242 La. 471, 137 So.2d 298 (1962).
There is no way this plaintiff can recover through a fair, legal and reasonable application of existing law and jurisprudence to the established facts of this case.
Recovery should be denied.
For these reasons, I respectfully dissent.
PER CURIAM

ON APPLICATION FOR REHEARING
On application for rehearing, Allstate argues that plaintiff was "severely rebuked" twice before the accident for exceeding 45 p. s. i. inflation pressure and therefore should have known of the extreme hazard to which he subjected himself by doing so.
The sole evidence in the record on this point is plaintiff's statement that "I went over on a couple of times and I got jumped for it by the foreman both times on this." Nowhere in the record is there a suggestion that plaintiff was jumped on because a severe explosion might result from overinflation or that he was warned the tire could rupture within the pressure capacity of the air supply. The record merely shows that plaintiff was instructed to perform an apparently simple and non-dangerous procedure; it does not show that he was instructed as to the non-apparent and unnecessary hazards.
The application is denied.
Application denied.
BAILES, Judge, (dissents).
I am of the opinion a rehearing should be granted for the reasons stated in my dissent. The contributory negligence of the plaintiff, clearly shown by the facts of the case, is a legal bar to recovery herein.
I respectfully dissent from the refusal of a rehearing herein.
NOTES
[1] Valiant's mock-up test also separated at less than 100 p.s.i.
[2] Plaintiff introduced into evidence two wheel disc and rim drawings submitted to Simplex by Treen Engineering Company, which Treen also headed, although he was not a registered engineer.