305 So.2d 572 (1974)
Mrs. Lillian D. CACIBAUDA, Individually and as natural tutrix and Administratrix of the Estate of the minor, Joseph Anthony Cacibauda, Jr., et al.
v.
E.S. GAIENNIE, Jr., et al.
No. 6402.
Court of Appeal of Louisiana, Fourth Circuit.
December 13, 1974.
Rehearings Denied January 14, 1975.
*575 Wiedemann & Fransen, Lawrence D. Wiedemann, A. Remy Fransen, Jr., New Orleans, for plaintiffs-appellees.
McLoughlin, Barranger, Provosty & Melancon, Lloyd C. Melcancon, New Orleans, for defendants-appellants.
Before STOULIG and MORIAL, JJ., and BOURG, J. Pro tem.
STOULIG, Judge.
This is an appeal from a $346,000 jury award to the widow and four children [1] of Joseph A. Cacibauda, who died as the result of extensive and painful injuries he received while on duty as a head operator at Chevron Chemical Company, Oronite Division in Oak Point, Louisiana. This suit, both for wrongful death and survival rights, is based primarily on the allegation that several officers and supervisors of Chevron were negligent in failing to remedy a hazardous condition in the plant where Cacibauda was employed and this *576 omission was the proximate cause of his death. He was injured when a Tote-bin conveying 3,100 pounds of hydrated lime fell on him after it slipped from an overhead monorail track, causing crushing injuries to his skeletal structure and equally painful internal injuries from ingestion of the caustic chemical.
Named defendants were E. S. Gaiennie, Jr., plant manager;[2] Alvin R. Adam, section day supervisor; Charles L. Jarreau, plant superintendent; L. R. Stevens, shift supervisor; Walter L. Stone, supervisor of administrative services; Wayne Snelson, coemployee-operator; and Fireman's Fund Insurance Company. At the time of the accident the insurer had in effect a $2,000,000 policy covering executive officers, managers and supervisors for individual acts of negligence toward employees while they were on the job. Therefore, the defense of the individual defendants was undertaken by the insurer's attorney. In view of a policy defense of no coverage raised by appellant insurer for the first time on appeal, we note the representation of all the defendants by insurer's counsel. That defense will be considered in detail later in this opinion.
Several questions of fact and law have been raised by defendants' appeal and plaintiffs' answer thereto. We will first consider the issue of liability.
The pertinent facts are these: On July 5, 1966, Cacibauda was injured in the mixer building at the Chevron plant while working with the Tote-bin system. An aluminum bin containing 3,100 pounds of hydrated lime was being moved from the chemical warehouse to a reactor in the mixer building. This system, designated specifically to move bulk chemicals both vertically and horizontally, had been in operation two years when Cacibauda was injured. Its components were an electrically-powered, twin-cabled hoist, a lift bar, and an overhead monorail supporting a traveling cradle that moved loads from the vertical lift horizontally to the dumping area. The procedures utilized in operating the Tote-bin system were to first move the bin by forklift truck and position it in a lift shaft at ground level. By means of a lift bar inserted across the top of the bin, it was hoisted to the second deck, or floor level. At this point the operator would lower the bin so that its lift bar would nestle in the hooks of the cradle attached to a monorail after which the lift hooks would be removed. The horizontal movement on the monorail to the reactor or mixer was not mechanized and required one man to pull a chain attached to the front of the bin while two others pushed it, one from the back and the other from the side.
It was during this horizontal movement stage that Cacibauda was fatally injured. He was positioned to one side of the loaded bin which hung from the monorail track. The distance between the track and the floor on which he was standing is 11 feet 2 inches. As he began to push the bin, it slipped loose from the track and fell on top of him. The impact caused the lid to pop off and the victim, in addition to being crushed by the heavy bin, was buried in its spilled caustic contents.
Chevron management conducted an exhaustive investigation as to the cause of the accident. In a report compiled by defendant Adam, it was concluded the Totebin dropped from the monorail because one end of the lift bar rested on the top outside edge rather than seating itself properly in the cradle hook. We quote those sections of the report titled "Observations and Investigation of Cause" and "Conclusion:"

"II. OBSERVATIONS AND INVESTIGATION OF CAUSE
"The lift bar had been thrown completely clear of the bin. It was found *577 in front of the elevator partly visible under lime. According to John Delger, it had been completely covered, but was stumbled on when they were looking for Joe. When the bin was lifted from Joe, it (the bin) apparently slid south along the deck. Two to four inches of lime covered the area indicated.
"The immediate area was raked for any objects which might explain the accident. None were found. The lime was swept up and placed in open-top drums in the chemical warehouse. The bin was raised and the area washed down.
"Inspection of the entire system, including bin, lift bar, cradle, and track failed to show any evidence of mechanical failure or malfunction which could have caused the bin to fall. In view of this, there appear to be only two possible reasons why the bin could have dropped as it did:
"1. No retaining bolt was placed in the bar and it slid sideways enough to slip off the cradle hook.
"2. When lowering the load into the cradle hooks, the north end of the bar did not nest down in the hook, but rested on the flat portion of the hook instead. * * *
"Discussion of (1)
"The possibility that there was no bolt in the bar is indicated because (a) none was found in the bar after the accident, (b) if one had been in place, its destruction and disappearance appear remote, (c) the P2S5 bin which had just been emptied at M-4 was suspended on a bar which did not have a bolt in it. In spite of this, absence of a retaining bolt is not believed to be the cause of this accident. Once the weight of the bin was hanging from the bar, it would have been impossible for the bar to move horizontally by any of the motions by which the bin was raised and placed in the cradle. This means that for this to be the cause, Joe would have had to place the bar in the bin ears in a very obviously faulty manner, with the end of the bar nearest to him barely protruding from the bin ear. In view of Joe's long experience with bin handling it seems extremely unlikely that he would have made such an obvious error in assembly.
"Discussion of (2)
"Since the bin was moved only a very short distance before it dropped, it is obvious that the bar was in an extremely precarious positionsuch as would have resulted from the bar end resting on the flat portion of the cradle hook. The side which came off the cradle was the one opposite the operator as he lowered the load into the cradle hooks. The hook was not visible since it is directly behind the Tote bin ear when viewed from the operator's angle. Tilting of the bin, because one end of the bar was not seated, was also minimized because most of the distortion was taken up by tilting of the cradle. This would not have been very obvious except to someone with considerable experience with the equipment. The surface of both the lift bar and the cradle hook were relatively rough, with enough friction between them to permit the cradle and load to be moved some distance before the bar slipped off. Also, the direction of the cradle movement was such that the hook was being pulled out from under the bar. * * *
"III. CONCLUSION
"There is no way of determining definitely which of the two possible causes was the one that brought on the fall of the bin. However, in view of the evidence and circumstances discussed above, the conclusion is that it was caused by the improper placement of the lift bar in the cradle hooks."
*578 It was well known to Chevron management the system was unsafe because the Tote-bin had fallen off the monorail on several previous occasions prior to the occurrence of the Cacibauda accident. An intercompany Safety Committee, designed to consider reports of unsafe conditions from employees and to remedy hazardous situations, discussed installation of safety slings on the Tote-bin as early as December 1964 and January 1965, some 18 months before the accident. The idea was rejected as possibly causing more problems than it solved. The December 1965 minutes reflected the Tote-bin dropped "recently" when a pin vibrated out of place. Defendant Walter Stone, permanent chairman of Chevron's Safety Committee, confirmed the fact that management was aware of the Tote-bin problem for some time before Cacibauda was hurt and he opined that safety is a "line management responsibility."
After the accident a fail-safe device was installed on the bin in the form of a chain attached to the top of the frame that held the rods which prevented it from falling to the floor. Bruce Bourgeois, a mechanic with Chevron at the time of the accident, testified he was assigned to study the system with a view toward designing a safety device to prevent the bin from falling. In November or December 1965 he recommended installation of a chain and shackle very similar in design to that actually installed several days after Cacibauda's accident.

DEFENDANTS' NEGLIGENCE
Under these circumstances we conclude a proximate cause of the accident was the negligent maintenance of a hazardous operation long after it became general knowledge at Chevron that the Totebin monorail system was unsafe. Not only was the worker subjected to the danger of being crushed by the heavy weight of a loaded bin should it fall but he also faced the added threat of exposure to large quantities of chemicals harmful to the human body.
We now consider whether the individual defendants are personally liable for the act of omission at Chevron that caused Cacibauda's death. The criteria we apply is that enunciated in Canter v. Koehring Company, La., 283 So.2d 716, 721 (1973):
"1. The principal or employer owes a duty of care to the third person (which in this sense includes a co-employee), breach of which has caused the damage for which recovery is sought.
"2. This duty is delegated by the principal or employer to the defendant.
"3. The defendant officer, agent, or employee has breached this duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstanceswhether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.
"4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages. If the defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally *579 should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm."
The executive officers cast in judgment included Alvin R. Adam, Charles L. Jarreau, L. R. Stevens and Walter L. Stone. When Cacibauda was injured, Adam was a section supervisor charged with the responsibility, inter alia, of supervising the mixer building. He inspected the Tote-bin system before it was installed and made the study on the safety sling fail-safe device that was rejected as too cumbersome. It is clear that he was in a position to correct the hazardous condition of which he was aware long before this accident occurred. Under the quoted jurisprudential rule he is personally liable.
Charles L. Jarreau, manager of operations, was Adam's immediate supervisor. In his testimony he admitted he was aware the bar "hung up" and the Tote-bin problem existed. He was fully apprised by reports of the Safety Committee meetings at which the need to install a fail-safe device on the Tote-bin was discussed. It was within his province to act to remedy this hazardous condition, and as a part of Chevron management, he was personally responsible for the safety of the plant employees.
Walter L. Stone, supervisor of administrative services and permanent secretary of the Safety Committee, testified that "line management," of which he, Jarreau, and Adam were a part, carried the personal responsibility for the safety of the Chevron employees. Stone knew of the need for a fail-safe device for more than a year before the accident and it is uncontroverted that Tote-bin had such a device on the market. Therefore, he is clearly liable under Canter.
With respect to L. R. Stevens, the record fails to establish that he had knowledge of the hazardous condition, or if he did that he was in a position where he had any obligation to correct it. It is doubtful that he had sufficient authority to make any changes whatsoever because he was promoted as shift supervisor on July 1, 1966 and was just beginning management training when the accident occurred. Prior thereto Stevens held the same position as did Cacibauda, that of head operator. Plaintiffs failed to prove that Stevens was acting as the shift supervisor to whom had been reported the falling of the bin from the monorail on two separate occasions prior to the accident. Under the Canter case, Stevens clearly is not liable.
We also conclude the plaintiffs did not establish a prima facie case of actionable negligence against Wayne Snelson. He was operating the controls of the Tote-bin, which he learned by "on-the-job training," when the accident occurred. He was never instructed to leave his position at the controls on the second level to check if the lift bar was properly cradled in the hook. This part of his testimony stands uncontradicted. Although Snelson testified Cacibauda himself hooked up the lift bar at ground level, Angelo Cascio, the other workman on the scene, denied this. In view of the quoted material from the Adam report, this factual dispute has little bearing on the question of Snelson's negligence. We reverse that part of the judgment holding Snelson liable because there is insufficient evidence to support a conclusion he was negligent.

CONTRIBUTORY NEGLIGENCE
We now turn to appellants' primary argument to defect liability, i. e., the alleged contributory negligence of Cacibauda. They point out he had been employed by Chevron since 1943 and was well acquainted with the Tote-bin system. As head operator on duty when the accident occurred he was the man in charge. The extent of his participation in this particular operation is disputed. According to Angelo Cascio he was in the office the entire time the bin was lifted vertically and transferred to the monorail conveyance. It *580 was only after the bin had cleared the lift shaft that Cacibauda walked to its side and positioned himself to help push it along the rail. As we stated previously, Snelson testified Cacibauda hooked up the bin in the shaft and gave the order to take it up. The Adam report indicates it is unlikely Cacibauda hooked up the lift bar ineptly because of his long experience. Further, a mistake in the vertical hook-up was not a contributing cause of the accident because the alleged negligence occurred during the horizontal movement phase. Defendants point out Cacibauda was working with an inexperienced operator and had prior knowledge of a defect or problem with the conveyor system. It is argued these circumstances should have compelled him to check the hook-up to the monorail before taking hold of the bin.
At this point we note the reason for the occasional malfunction of the Tote-bin was not explained. It seems to have fallen off the track while being operated by experienced crews; therefore, we know of no fact that should have caused Cacibauda to suspect the previous malfunctions resulted from inexperience in handling the equipment. Before we would charge Cacibauda with the responsibility to check the hook-up prior to pushing, we would first have to find that he should reasonably have anticipated danger from this source.
Contributory negligence is conduct on the part of the injured party that falls below a standard to which he should reasonably be expected to conform for his own safety and protection.[3] Applying that general statement to the instant case the question posed is whether a reasonable man having Cacibauda's prior knowledge and experience would have inspected the bin hook-up before positioning himself beside it. The answer is no. There is insufficient evidence to warrant finding a reasonable man should have anticipated a threat to his safety in performing the functions Cacibauda was doing when the accident occurred. We further note the evidence establishes the improper hook-up was not apparent from the position in which Cacibauda viewed the bin. Having failed to establish prior knowledge of danger or an opportunity to observe the threat, the affirmative defense fails. The burden of proving contributory negligence rests on the defendants alleging it.[4]
Defendants have argued we should supply the presumption of adverse testimony either to weigh the preponderance in their favor on the contributory negligence plea or against the plaintiffs in evaluating whether a prima facie case has been proved. Defendants point out 11 witnesses were subpoenaed and present in court who were not called to testify. In rebuttal argument to the jury, plaintiffs' counsel stated their testimony would have been repetitive. The record is very long. Numerous witnesses, both fact and expert, were produced by the plaintiffs, including both eyewitnesses to the accident; two safety experts; and the medical experts directly connected with the treatment of Cacibauda from injury to death. While we are not aware of the nature of the testimony the unknown 11 witnesses would have given, we cannot help but conclude it would have been cumulative or repetitious. All aspects of this case were thoroughly explored by plaintiffs' evidence. Under these circumstances and absent a showing the uncalled witnesses possessed knowledge that could have clarified an indefinite factual issue, the presumption these witnesses would have testified adversely to the party failing to call them will not be supplied.[5]
*581 Accordingly we affirm the jury's finding of liability with respect to Alvin R. Adam, Charles L. Jarreau and Walter L. Stone.

THE INSURER'S LIABILITY
For the first time on appeal, the insurer urged a policy defense. It is now contended on behalf of Fireman's Fund that the coverage afforded the individual defendants of $2,000,000 is subject to a $2,000,000 deductible. On its surface this statement appears to be contradictory since the deductible apparently negates the coverage. Counsel for defendants explained the policy of insurance written to cover Chevron's executive officers and managers is simply a vehicle to permit Fireman's Fund to adjust the named insured's claims against executive officers, managers and employees covered and that Chevron is actually self-insured. Before considering its merits we note this argument appears in the brief submitted on behalf of both the individual defendants and the insurer. It is inconceivable to us that appellants Adam, Jarreau, Stevens, Stone, and Snelson would ask us to relieve the insurer of liability and impose the whole financial burden on them. At first blush there appears to be a hopeless conflict of interest. Possibly Chevron has some indemnification agreement with these defendants but this is not apparent from the record. In any event the argument has no merit.
We quote those sections of the policy and the rider attached thereto upon which the policy defense is based.
From the policy:

"INSURING AGREEMENTS
"I. COVERAGE ABODILY INJURY LIABILITY
"To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages, including damages for care and loss of services, because of bodily injury, sickness, disease or mental anguish, including death at any time resulting therefrom, sustained or alleged to have been sustained by any person.
* * * * * *

"III. DEFINITION OF INSURED
* * * * * *
"A. Under Coverage A, except with respect to the ownership, maintenance or use of automobiles while away from the premises owned, rented or controlled by the Named Insured or the ways immediately adjoining, any officer, director, executive, managing employee or stockholder thereof, while acting within the scope of his duties as such or by reason of his being an officer, director, executive, managing employee or stockholder, any organization or proprietor with respect to real estate management for the Named Insured.
* * * * * *
"C. As respects operations other than the ownership, maintenance or use of an automobile, any employee of the Named Insured other than employees included in paragraph A of this insuring agreement when acting in such capacity, provided that the Named Insured consents to the extension of coverage to such employee after claim has been made or suit or other legal action has been commenced against such employee.
* * * * * *

"CONDITIONS
* * * * * *
"14. REIMBURSEMENT
"A. The Named Insured shall reimburse the Company, upon demand, for all Paid Losses under Insuring Agreement I, Coverage A. The words `Paid Losses' as used in this paragraph A shall mean (1) losses paid by the Company and (2) all Allocated Loss *582 Expenses, which means the actual payments made by the Company for expenses in connection with each specific claim, excluding the cost of investigation and adjustment by salaried employees or fee adjusters.
"B. The Named Insured shall reimburse the Company, upon demand, for all Paid Losses under Insuring Agreement I, Coverage B. The words `Paid Losses' as used in this paragraph B shall mean (1) losses paid by the Company and (2) all Allocated Claim Expenses, which shall include, without limiting the generality of the term, fees of attorneys, adjusters, photographers, stenographers, witnesses, and others not in the regular employ of the Company, for services in connection with the adjustment of claims and the conduct of hearings and legal proceedings necessary or incidental thereto, court costs and premiums for release and attachment, removal, appeal and bail bonds.
"C. In the event of the Insured's non-compliance with the Premium Computation Endorsement and/or Paragraphs A and/or B of this condition, the Insured agrees to indemnify the Company for all such amounts which may become due under the Premium Computation Endorsement and/or Paragraphs A and/or B, plus all costs and expenses incurred by the Company, including without limitation, attorney's fees, in collection of such amounts."
From the endorsement:
"It is agreed, effective October 1, 1963, solely as respects losses outstanding as of January 1, 1965, Condition 14. REIMBURSEMENT is deleted and replaced by the following:
"14. DEDUCTIBLE PROVISION:
"With respect to the insurance afforded:
* * * * * *
"B. under Coverage A, $2,000,000 and all allocated loss adjustment expense shall be deducted from the total amount of all sums which the insured shall become legally obligated to pay and allocated loss adjustment expense as a result of one occurrence,
and the Company shall be liable only for the difference between the applicable limit of liability as stated in the policy and the deductible amount applicable to each occurrence * * *."
This endorsement has a limited application. In order for the Deductible Provision to replace the Reimbursement Provision, the loss must be outstanding as of January 1, 1965. Plaintiffs' claim still has not reached the status of being a "loss outstanding" and will not be until successfully prosecuted to final judgment. As we interpret the clauses quoted, the Deductible Provision had no efficacy unless the loss had accrued on or before January 1, 1965. Thus the policy defense has no merit.

THE EXCEPTION OF PEREMPTION
Defendants plead the exception of peremption in bar of the right of recovery by Joseph Cacibauda, Jr., arguing that more than one year had elapsed between his father's death and the date his suit was filed.[6] As we stated before, Cacibauda was injured on July 5, 1966 and died on July 19, 1966. The original petition, filed June 30, 1967, alleged Mrs. Lillian D. Cacibauda was a plaintiff appearing individually and as "natural tutrix and administratrix of the estate of the minor, Joseph Anthony Cacibauda, Jr."
Defendants filed exceptions including one of lack of procedural capacity against *583 Mrs. Cacibauda who had not formally qualified as tutrix of the minor, Joseph, Jr. This exception was sustained by the trial court and while that judgment was pending before this court, Mrs. Cacibauda applied for and was issued letters of tutorship on March 27, 1969. Copies of the letters were filed in this court before the merits of the judgment maintaining the exception of procedural capacity were adjudicated. In Cacibauda v. Gaiennie, 222 So.2d 632 (La.App. 4th Cir. 1969), it was ruled Mrs. Cacibauda had corrected the procedural deficiency and the objection was moot.
After this matter was remanded for further proceedings, plaintiffs amended their pleadings to recite, inter alia, Mrs. Cacibauda was the qualified tutrix of the minor, Joseph, Jr. Defendants filed exceptions of peremption, prescription and abatement asserting that such action was barred under the one-year provisions of C. C. arts. 2315 and 3536.
Defendants cite C.C.P. art. 4061 [7] to support their argument that Mrs. Cacibauda could only institute a valid suit for Joseph Jr., after qualifying as natural tutrix. The spirit of this and other laws governing the rights of minors have for their purpose the conservation of the minor's estate and the establishment of a form of security from which he can be reimbursed if his assets have been dissipated before he attains majority.
Under C.C. art. 250, Mrs. Cacibauda had the right to qualify as natural tutrix of her minor son when her husband died, and upon doing so, was bound to comply with C.C.P. art. 4061. Under C.C. art. 253,[8] she was also given the option to reject the tutorship; however, this codal provision makes it mandatory for her to administer the minor's estate until she causes the appointment of a tutor. While it is true she did not refuse to accept the tutorship, neither had she signified her acceptance by formally qualifying as of June 30, 1967, the date the petition was filed.
This pleading identifies Mrs. Cacibauda in her representative capacity as "natural tutrix and administratrix." This was sufficient to timely state a cause of action on behalf of the minor, because the filing as "administratrix" is in compliance with the obligation imposed on her to temporarily administer the minor's estate until a tutrix is qualified. The fact that she later qualified as tutrix, and in so doing cured the exception of procedural capacity quoad the tutorship, is of no moment. Had Mrs. Cacibauda caused someone other than herself to be appointed as tutor or tutrix under C. C. art. 253, he or she would have been substituted as party plaintiff to represent the minor. In this case Mrs. Cacibauda's filing as administratrix constituted a timely action. That it was Mrs. Cacibauda who qualified after suit was filed and not a third party is of no consequence, because her obligation to conserve the assets of the minor's estate is due first as a mother and administratrix, and then as a natural tutrix, should she choose to qualify.
We hold the suit for Joseph Cacibauda, Jr., was filed timely by his mother as administratrix and the procedural deficiency, though cured more than a year after the right of action accrued, does not support a plea of prescription or peremption.

QUANTUM
Plaintiffs argue the awards are inadequate, while defendants urge they are excessive. Both sets of litigants ask us to adjust quantum on the theory the jury abused the "much discretion" vested in it *584 by C.C. art. 1934. Before discussing the individual awards to each of the five plaintiffs, we note their respective claims consist of their rights of action for the wrongful death of Cacibauda and their interest in the survival action for the decedent's pain and suffering. (C.C. art. 2315.)
We will first consider the award of $272,000 to Mrs. Lillian Cacibauda, the widow, which compensated her for (1) loss of love and affection; (2) loss of past and future income; (3) medical expenses and the funeral bill; and (4) the pain and suffering of her husband. The record fails to disclose the specific figure the jury assigned for each item, but the special damages are uncontroverted and may be listed as follows:

Loss of past wages $ 59,850.00
Loss of future wages
(discounted to present value) 53,362.00
West Jefferson Hospital 2,500.00
Dr. Talbot 450.00
Motor Funeral Home 2,111.07
 ____________
 $118,273.07

We note defendants' contention that the figures presented to the jury establishing loss of past and future income are unrealistic. The figures we accept for loss of past and future wages were computed by Glenn Mouton, an actuary with a New Orleans life insurance company who appeared as an expert for plaintiffs. In reading his testimony we were impressed with his effort to present an objective, realistic and fair evaluation of the loss of income. Defendants offered no expert actuary to counter any of Mouton's testimony or to challenge his method of computation.
On appeal defendants urge us to reduce the future lost wage award by cost of transportation to work, clothes expense, social security, taxes, lunches, union dues and other expenses an employee must bear as an incident of his employment. We are also reminded that Cacibauda, had he lived, could have been subjected in his work life to layoffs, illness and reduction in employment. Defendants offered no evidence to establish to what degree, if any, Cacibauda was threatened by either a temporary or permanent layoff. He had been continuously employed by Chevron for 23 years at the time of his death and with this record we find the likelihood of his being unemployed remote.
Loss of future wages need not be proven with mathematical certainty. Bailey v. Moore, 276 So.2d 708 (La.App. 1st Cir. 1973). This being the case we will not attempt to reduce the only computation of the present value of lost future wages by the expenses the decedent would incur in actually working during this period. Nor will we indulge in speculation as to how his future income would have been affected by sickness or layoffs had he lived.
The only purpose we have in the approximate amount apportioned by the jury for each element of damages is to enable us to weigh the abuse of discretion contentions urged by both plaintiffs and defendants. If we subtract the enumerated special damages ($118,273.07) from the total award ($272,000) the remainder of $153,726.93 represents general damages. Under the special circumstances of this case we would assign $95,000 to the widow for wrongful death damages and $58,726.93 as the heritable portion of the pain and suffering award. We conclude, under the Gaspard rule,[9] these amounts were not subject to appellate modification.
As to the allocation made for the wrongful death portion of the general damages, the circumstances which influenced us are: Lillian and Joseph Cacibauda were married 27 years at the time of the accident. Together with four children they were a close knit family group who regularly met at their parents' home for social activities. During the three weeks immediately before the accident, Mr. and Mrs. Cacibauda had gone on their first vacation without their children. It is apparent they were a happy *585 compatible couple. Having reared their four children, they were reaching the point in life where soon they would have more time to share with each other. At the time of his death Cacibauda was 53 years of age and his wife was 42 years old. His death changed Mrs. Cacibauda from a congenial active woman to one whose nervous condition caused her to withdraw from many former activities. Under these circumstances an award of $95,000 to the surviving spouse as individual damages for the wrongful death of her husband is not an abuse of discretion.
The remainder of the general damages of $58,726.93 must be allocated as the quantum granted to Mrs. Cacibauda for her husband's pain and suffering during the 15 days he survived after the accident. Admittedly this sum is greater than customarily awarded for this item of damage.
His case was described as the worse injuries ever witnessed by Mrs. Lillian Weathers, a registered nurse of long experience who attended Cacibauda during his hospitalization. Cacibauda received burns to his eyes, head and other parts of his body and sustained a flail chest caused by multiple broken anterior and posterior ribs together with two broken legs. To complicate matters, the ingested chemicals produced severe internal tissue damage. The caustic nature of the lime under which Cacibauda was buried is evidenced by the fact that the co-workers who were assisting in rescuing him were repeatedly required to seek fresh air outside of the building so that their lungs could again tolerate the toxic atmosphere. When he was finally freed from beneath the fallen bin his face was encrusted with the burning lime.
More specifically his injuries were diagnosed as a flail-type chest injury, numerous rib fractures, a partial collapse of both lungs, a lacerated liver, fractures of the right and left femur and the right tibia and fibula. Both lungs were inflamed from the ingested lime.
Cacibauda was conscious during most of his 15 days in the hospital and his pain level was so intense he was administered morphine every four hours. The combined injuries to the ribs and lungs made breathing extremely painful. Initially upon admission to the hospital, a tracheotomy was performed to facilitate his breathing; however toward the end, his breathing became so labored and painful it became necessary to insert a tube directly into the lungs.
This case points to the inadequacy of money to compensate an individual for pain and suffering, yet it is the only medium we have. Even so, we think $58,726.93 for 15 days of pain and suffering is extremely liberal. While we would not fix the figure at this amount, we are mindful of the oft-cited Gaspard admonition that appellate courts are not to modify damage awards unless the trial judge or jury has abused the "much discretion" vested in it. Accordingly we will not modify this judgment.
By the same token we will not adjust the jury verdict with respect to the damages awarded to the children. We think they are low to compensate each child for both the loss of love and affection and their heritable interest in the survival action. But the limited circumstances, if any, under which an appellate court may now adjust damages, applies both to increases and decreases.
As we mentioned previously the Cacibauda family was a close and congenial unit. The three daughters were 21 years of age or older and Joseph, Jr., was 15. Mrs. Eleza Loyacano was married when her father died and Antoinette Cacibauda, 23 at the time, later married. Patricia Cacibauda, 21 when her father died, has never married and was living at home with her mother when this matter was tried.
Joseph, Jr., was 15 at the time of the accident, later finished college and is employed in the field of music education in Bay St. Louis, Mississippi. He is still in close contact with his mother and sisters.
*586 The jury made the following awards to the children:

Joseph A. Cacibauda, Jr. $29,000
Antoinette R. Cacibauda 15,000
Patricia A. Cacibauda 15,000
Eleza Loyacano 15,000

The logic of favoring Joseph, Jr., is apparent in that he was deprived of his father's companionship during six formative years, whereas the daughters had either reached or passed majority when they lost their father. We do not know what value the jury assigned the wrongful death claim and the survival claim in each individual case.
Plaintiffs argue the jury apparently overlooked the fact that under C.C. art. 2315 the major and minor children of Cacibauda had a heritable interest in the survivor claim. In reviewing the jury charge we note the trial judge gave the proper instruction on this point of law by informing the jury the father's action for pain and suffering survived in favor of his wife and children.
C.C. art. 2315 designates to whom the action accrues on the death of the injured party but it does not regulate how the award is to be apportioned among the designated survivors. The jury awarded the widow a large percentage of the pain and suffering quantum, and we found the figure high but not beyond the limits permitted the jury under the "much discretion" rule. Although the survival award to the children is modest, we will not take away from the widow to increase the judgments in favor of her children.
Finally we consider plaintiffs' argument that we should amend the award of legal interest. When suit was filed on June 30, 1967, legal interest was set at 5 percent by C.C. art. 1938. In 1970 this article was amended to increase it to 7 percent. Plaintiffs request the judgment awarding interest be amended to allow the larger interest rate from the effective date of the amendment.
Since suit was filed three years prior to the amendment, the legal interest rate in effect at that time is the proper amount of the award. Legal interest is a substantive matter and for a change to be given retroactive effect the law must so provide. In this case the legal interest rate of 5 percent is correct. Parish of East Baton Rouge v. Harrison, 260 So.2d 106 (La.App. 1st Cir. 1972). The Supreme Court refused writs[10] and in so doing tacitly approved this result.
For the reasons assigned, the appeal of E. S. Gaiennie, Jr., is dismissed; the judgment appealed from is reversed insofar as it cast defendants L. R. Stevens and Wayne Snelson in judgment; and plaintiffs' suit against both of these individual defendants is dismissed. In all other respects the judgment appealed from is affirmed. Defendants cast are to pay all costs of this litigation.
Appeal dismissed in part; reversed in part; affirmed in part.
NOTES
[1] Plaintiffs are Mrs. Lillian D. Cacibauda, the widow; Mrs. Eleza Cacibauda Loyacano; Miss Antoinette Regina Cacibauda; Miss Patricia Alie Cacibauda and Joseph Anthony Cacibauda, Jr. When suit was filed Joseph, Jr., was a minor and his mother appeared as a plaintiff individually and as his natural tutrix. Upon attaining majority, he joined in as a plaintiff to pursue his own claim.
[2] E. S. Gaiennie, Jr., died before this case came to trial and plaintiffs did not substitute his estate as a party defendant. Although an appeal was taken in behalf of "E.S. Gaiennie, deceased," we dismiss it on our own motion because he was not cast in judgment.
[3] Hall v. Hartford Accident & Indemnity Co., 278 So.2d 795 (La.App. 4th Cir. 1973).
[4] King v. King, 253 La. 270, 217 So.2d 395 (1968).
[5] The cases cited by defendants: Hates v. Blitz, 205 La. 536, 17 So.2d 816 (1944); and Perez v. Meraux, 201 La. 498, 9 So.2d 662 (1942), enunciate the adverse presumption rule but are inapplicable as precedents to the situation before us.
[6] C.C. art. 2315.
[7] "Before a natural tutors enters upon the performance of his official duties, he must take an oath to discharge faithfully the duties of his office, cause an inventory to be taken, and cause a legal mortgage in favor of the minor to be inscribed, or furnish security, in the manner provided by law."
[8] "The mother is not compelled to accept the tutorship of her minor children, but in case she refuses, she shall be bound to fulfill the duties of a tutor, until she has caused a tutor to be appointed."
[9] Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963).
[10] 261 La. 1062, 262 So.2d 43 (1972).