412 So.2d 109 (1982)
Pauline MARTINEZ
v.
UNITED STATES FIDELITY AND GUARANTY and Darrell Ford.
No. 11471.
Court of Appeal of Louisiana, Fourth Circuit.
February 10, 1982.
Rehearing Denied April 16, 1982.
*110 Wayne W. Yuspeh, Metairie, and R. Ray Orrill, Jr., New Orleans, for plaintiff-appellee.
Donovan & Lawler, James L. Donovan and C. Suzanne Dittmer, Metairie, for defendants-appellants.
Before SAMUEL, REDMANN and BOUTALL, JJ.
SAMUEL, Judge.
Plaintiff was awarded a $485,000 judgment pursuant to a jury verdict in an executive officer suit[1] against Waterbury Drugs, Inc. vice president-treasurer Darrell Ford for allegedly breaching his duty of providing her, a Waterbury employee, with a safe place to work and of refraining from assigning her duties which would precipitate a nervous breakdown. Two incidents form the basis of the claim: (1) On February 25, 1975 plaintiff tripped over an electric cord as she arose from her desk; and (2) after returning to work on April 19, 1975, Ford assigned her to unusually heavy duties which precipitated or accelerated a nervous collapse. Defendants, Ford and his liability insurer, United States Fidelity and Guaranty Company,[2] have appealed.
The issues before us are whether: (1) plaintiff was contributorily negligent; (2) an inconsistent factual finding of the jury *111 arguably in conflict with its general verdict requires vacating the judgment and remanding for a new trial; and, alternatively, if issues 1 and 2 are resolved favorably to plaintiff; (3) the award for general damages is excessive; and (4) the evidence supports the special damages award.

LIABILITY
At the time plaintiff tripped over the wire, she had been employed by Waterbury for approximately three years. During that interval she had left temporarily and returned. There were electric cords extending from various desks to wall outlets in the office in which she worked. Prior to plaintiff's fall, several other employees had tripped over these cords, and it was general knowledge that from time to time employees had so tripped. Darrell Ford, the Waterbury corporate officer who, at the time of the first incident in suit, functioned as office manager, knew of the prior trippings by other employees, had authority to make any changes needed to remove the hazards, and failed to do so.
Plaintiff was seated at one of three desks arranged in an L shape with her back to the wall some 6 to 7 feet behind her. Another desk, similarly placed to her immediate right, was occupied by Pat Telhorst, who witnessed plaintiff's fall and was the only one to describe it with clarity. A third desk, with its length perpendicular to the same wall, formed the base of the inverted L and made it impossible for plaintiff to emerge from this semienclosed area by walking behind Mrs. Telhorst's desk to her right and thus entering the general office area. Plaintiff had only one exit to her left.
According to Mrs. Telhorst, Ford instructed plaintiff to go to the bank. Plaintiff had a backlog of work and was not accustomed to performing this duty at this time. She expressed irritation, got up from her desk, turned to her left to exit the area, and tripped over the cord of a ten-key adding machine. Because the cord was brown and the floor was the same color, it was difficult to see. As the cord on the machine was not of sufficient length to permit it to stretch flat across the floor between the desk and the wall outlet, at the time plaintiff tripped it was at ankle height.
There was a calculator on the right side of each desk used by plaintiff and Mrs. Telhorst from which cords also stretched across the floor area to the wall outlets, but these were not involved in the fall. Both machines were on the right side of each desk because both ladies were right-handed.
The record fails to explain why the ten-key adding machine was on plaintiff's desk. It was normally kept on a desk which abutted the wall opposite her desk. Ford stated he occasionally used the desk plaintiff occupied the day of her fall when he worked at night. The record further reflects the machine was to plaintiff's left. The adding machine could be moved from desk to desk as it was needed.
There are several steps Ford could have taken to eliminate the trip hazards created by the cords, including moving the desks so that the sides abutted the wall and placing the machines on the edges immediately adjacent to the wall.
As a result of her fall, Mrs. Martinez was away from the office for approximately two months. On April 19, 1975, her first day back on the job, Ford gave her as her first assignment a strenuous job usually given to two people. She was to separate records of Waterbury in storage on the mezzanine area from those of another company, and in order to accomplish this she would be required to move heavy boxes. Normally an office handyman was sent with the employee so assigned and, in his absence, two office workers performed the job. Several coworkers, pointing out plaintiff's nervous state, offered to go in her place. Ford insisted plaintiff go alone. After working in the hot and dusty area several hours, she returned to the office, her clothing soiled by the dust and her manner distraught. Unable to continue, she called her son to drive her home. She did not return to work.
Plaintiff testified she did not understand why Ford made her do this particular work *112 because it was a man's work and he knew she was returning to work on a trial basis. Before Ford became office manager, plaintiff had acted in that position until she left Waterbury the first time. When she returned, at Waterbury's request, her job description was bookkeeper and Ford was her immediate supervisor.
Plaintiff's claim rests on the assertion that Ford breached his duty as an executive officer to provide her with safe work surroundings (R.S. 23:13). Because executive officer liability is determined by general tort principles enunciated in our jurisprudence interpreting the fault concept of Civil Code Article 2315 (Canter v. Koehring Company, La., 283 So.2d 716), the affirmative defense of contributory negligence is appropriate. Miller v. Employers Mat. Liability Ins. Co., La.App., 349 So.2d 1353.
The negligence of Ford in failing to remedy an admittedly unsafe condition is clear. Whether Mrs. Martinez was contributorily negligent is a closer question. In Smolinski v. Taulli, La., 276 So.2d 286, contributory negligence was defined as conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection. The standard of conduct used to measure contributory negligence is determined by reasonableness of behavior under the circumstances.
In executive officer suits, the standard of care imposed on the workman is less stringent than in ordinary cases where contributory negligence is at issue because the employee at times must involve himself in known hazardous endeavors in order to retain his employment. As economic coercion is a factor in determining reasonable conduct by a workman, the standard by which the contributory negligence of an employee is measured in an executive officer suit was defined in Miller v. Employers Mut. Liability Ins. Co., supra, at page 1362, as follows:
"Emerging as criteria for determining an employee's contributory negligence are: (1) relative knowledge of the danger by the supervising employee and the injured employee; (2) relative control over the employee's situation; (3) the degree to which the employee's conduct is voluntary on his part; (4) alternatives available to the employee; (5) obviousness of the danger; and (6) relative ability to eliminate the danger."
Applying the Miller criteria to this case, we note appellants did prove that the existence of trip hazards from electric cords was a fact known to both plaintiff and Ford. Clearly, Ford could have removed the hazard at a minimal cost to Waterbury. Plaintiff did not have the ability to correct the situation by rearranging furniture or installing outlets that would eliminate exposed cords. The authoritarian manner in which Ford operated the office is demonstrated by his assigning plaintiff to heavy physical duty without the customary assistance on her first day back to work. He refused to consider a suggestion of co-employees that they do the job because plaintiff was not well.
Further, appellants failed to prove the wire over which plaintiff tripped was one of which she was aware. The record does not contain an explanation of how the ten-key adding machine was moved to plaintiff's desk from its usual spot on a desk across from where she sat, who moved the machine, and at what time this was done. There is no showing that plaintiff passed this wire daily, and the position of the machine indicates she did not use it because it was to her left and she is right-handed. Nor does the evidence establish plaintiff had an opportunity to see the cord and avoid it. Brown in color, it matched the floor. In arising from her desk, she would have had to look directly down at the floor in order to see the ankle high wire.
Accordingly, our review of the record discloses no manifest error in the jury's finding that plaintiff was not contributorily negligent.
We mention the jury also found the contributory negligence of plaintiff was excused by momentary forgetfulness, which is an apparent contradiction in findings. We *113 quote the questions propounded as they appear in the record:
"5. Was Mrs. Martinez guilty of contributory negligence?
 (Answer yes or no) No 
6. Was this contributory negligence excused by Mrs. Martinez's momentary forgetfulness?
 (Answer yes or no) Yes 
Application of the momentary forgetfulness doctrine presupposes a finding of contributory negligence, which, in view of our conclusion, need not be discussed. We note that Question 6 seems to require a "yes" or "no" answer. Perhaps it would have been more understandable if Question 6 was prefaced with the phrase, "If your answer to Question 5 is yes, ..." In any event, it suffices to say the jury found no contributory negligence and we agree.
Appellants have cited several cases wherein a plaintiff who tripped over a wire was held to be guilty of contributory negligence. Masters v. State Farm Insurance Company, La.App., 266 So.2d 508, involved a visiting neighbor who tripped over a Christmas light electric cord stretched across the porch; Hawsey v. United States Fidelity and Guaranty Co., La.App., 211 So.2d 417, was a customer trip and fall case; and Geiger v. Larrieu, La.App., 246 So.2d 713, involved a claimant who was not an employee of defendant. These cases are inapposite because the standard of the reasonable man in measuring contributory negligence differs. Knowledge of the hazard alone, as in this case, does not support a plea of contributory negligence (or assumption of risk) where a party charged with the duty of providing a safe work environment fails to do so. Hall v. Hartford Accident & Indemnity Co., La.App., 278 So.2d 795.
As to the second incident, it is appellants' position that Ford cannot be liable in tort because he did not know the job assignment would cause or contribute to her mental breakdown, if in fact this happened. On this aspect of liability, the following questions were propounded to the jury with the response noted:
"8. On April 19, 1975, did Darrell Ford knowingly, intentionally and deliberately require Mrs. Martinez to perform duties that caused or contributed to her mental breakdown?
 (Answer yes or no) Yes 
9. As of April 19, 1975, did Darrell Ford know that the duties requested of Mrs. Martinez would cause or contribute to her mental breakdown?
 (Answer yes or no) No ."
Appellants argue imposition of liability for the April 19, 1975 incident must be based on a factual finding that Darrell Ford knew the assignment to sort invoices in the storage area would cause or contribute to plaintiff's mental breakdown. When the jury found no knowledge, it is contended, the verdict awarding damages for this incident was inconsistent with the factual finding. Under these circumstances, appellants urge, the trial court was required by Code of Civil Procedure Article 1812 to: (1) enter judgment consistent with this answer; (2) require the jury to deliberate further; or (3) grant a new trial. They further claim the case of Samson v. Southern Bell Telephone & Telegraph Co., La.App., 205 So.2d 496, is controlling and holds that tort liability of an executive officer for nervous disorders caused by a job assignment is present only when the officer knows the work will produce a nervous breakdown.
We disagree with both contentions. While decisions of the Court of Appeal, First Circuit, often furnish guidance and enlightenment, they are not controlling on this circuit. Second, we interpret the holding therein to impose liability on a responsible officer who requires performance of a duty which he knows or reasonably might be expected to know would produce deleterious results. The court in Samson was careful to point out the facts of each case should be individually considered.
In Samson, the worker was ordered to perform a task which the supervisor knew his treating psychiatrist advised against. Plaintiff suffered a breakdown and filed suit for workmen's compensation and, alternatively, sued the supervisor in tort, alleging the officer knowingly assigned him to duties he could expect would produce nervous disorders. The appeal was from a trial *114 court judgment dismissing both demands on an exception of no cause of action and the allegations of the petition were treated as true. After holding workmen's compensation was not available to a claimant suffering mental stress because it was not an accident within the meaning of the Workmen's Compensation law, the court concluded he could sue in tort.
The Samson court simply held that a petition alleging an employee suffered a breakdown from a job assignment that the supervisor knew might produce this result stated a cause of action. It reasoned the duty to provide a safe place to work not only included safe physical surroundings but the duty to refrain from assigning employees to duties which knowingly might create stress and mental harm.
Hence, once the jury found Ford "knowingly, intentionally and deliberately" required plaintiff to perform duties that caused or contributed to her mental breakdown, it was proper to award damages for the condition assuming the evidence supported this finding. Civil Code Article 2315: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."
The evidentiary basis for this finding is sound. Plaintiff returned to work on a trial basis and on her very first assignment, Ford sent her into the storage area of the building and required her to move heavy boxes and sort invoices. Before she left the office to do this task, several coworkers protested the assignment and offered to go in her place. Plaintiff was 50 years of age. Usually, if digging through old records was required, two employees were sent because of the weight of the boxes. The assignment was unusual and unreasonable to the extent that the usual assistant was not furnished.
We conclude the evidence supports the jury finding of liability for both incidents.

QUANTUM
Defendants next argue the jury verdict on quantum, itemized below, is excessive:

 "GENERAL DAMAGES
For pain and suffering, past, present
and future, related to those injuries
suffered.................................. $147,000.00
 SPECIAL DAMAGES
Loss of past wages........................ 39,000.00
Loss of future wages
 (impairment of earning
 capacity)............................... 67,000.00
Medical expenses
 (past, present, and future)............. 232,000.00"

Waterbury personnel took plaintiff to Dr. William Roy immediately after the February fall, and he, in turn, sent her to a hospital emergency room for a neurological checkup. There she saw Dr. Richard Levy, a neurosurgeon, who diagnosed her condition as a mild concussion with an abnormal emotional response and released her from the hospital two days after she was admitted. In two outpatient visits to his office in March she complained of headaches and nervousness, but was advised she could attempt to return to work. She did not see Dr. Levy again until June 2, 1975, six weeks after the April incident, when she had complaints of numbness of both hands, headaches and dizziness. Concluding the problems were emotional rather than organic in origin, Dr. Levy suggested plaintiff consult a psychiatrist.
On June 22, 1975, she saw Dr. Millard Jensen, a psychiatrist, who has treated her on a continuing basis since that time and anticipates having her as a patient for the rest of her life. Dr. Jensen testified the February fall precipitated the emotional breakdown and was of the opinion that both incidents caused a mental disintegration which prevents plaintiff from functioning in normal ways. Her physical symptoms at various intervals have been double vision, fainting, severe headaches, and weak spells accompanied by nausea and vomiting. Her emotional state is marked by frequent depression and anxiety. Between the time of initial treatment and trial, plaintiff had been hospitalized twice for psychiatric treatment. Dr. Jensen explained she functions best in a sheltered environment, such as a hospital where most of her needs are met by someone else.
*115 The fainting or blacking out has caused plaintiff to fall frequently and this has produced orthopedic problems. In this regard she first consulted Dr. Courtney Russo, an orthopedist, in May, 1976 with complaints primarily in the area of the lumbar spine. He recommended conservative treatment including the use of a wedge in one shoe to compensate for a pelvic tilt, and a back corset. By January, 1977, the lumbar spine problem apparently subsided until May, 1978. In Dr. Russo's opinion the February and subsequent falls could have activated a dormant arthritic condition.
Plaintiff also had complaints in the cervical area for which she was hospitalized three times and treated with traction and heat. In addition, Dr. Russo operated on both wrists to release a pinched nerve in each hand. He had not seen plaintiff for at least six months prior to trial, had prescribed traction for the cervical area at her home, and had told her to return on an "as needed" basis.
In summary, the unrebutted medical testimony establishes plaintiff suffered from severe mental problems which have produced physical complaints partially psychological in origin. The arthritic condition, aggravated by occasional falls, also has activated orthopedic problems. More seriously, plaintiff's present inability to cope with the routine activities of daily living is a disabling condition which does not appear to have any resolution.
In our view, considering that plaintiff was 50 at the time of the incidents in suit, an award of $147,000 in general damages does not exceed the "much discretion" which Civil Code Article 1934(3) vests in the jury. We are of the opinion the general damages award is at least on the generous end of the quantum spectrum; and what constitutes the boundaries of "much discretion" on the high and low sides defies precise definition. But, in this case, we conclude the rule of Coco v. Winston Industries, Inc., La., 341 So.2d 332, and similar cases compels us to affirm the general damages award.

SPECIAL DAMAGES
Appellants contend the proof offered by plaintiff fails to support the awards for loss of past and future wages. We agree. Economist Dr. Melvin Wolfson based both computations on a salary of $200 per week. However, Waterbury's records reflect that plaintiff was earning a gross weekly salary of $160 and a net weekly salary (after taxes) of $121.04 at the time of the incidents. As a recovery of lost wages is taxable as income, the former amount is the proper basis to make the computations.
We compute loss of past income by multiplying the weekly salary of $160 by the number of weeks of unemployment between the incidents and the trial (204) and arrive at $32,640, or $6,360 less than the amount awarded by the trial court judgment for that item.
As to loss of future wages, we note Dr. Wolfson testified plaintiff had an 8.4 year work life expectancy from the date of the trial. Using the $200 per week salary base and rounding off the income to the nearest thousand figure, he projected loss of annual income of $10,000. Multiplying annual income by life expectancy, he concluded future lost earnings would total $84,000, and discounting this figure by 5%, he concluded $67,200 would compensate for future lost wages. Although Wolfson made an upward adjustment to $74,500 to allow for the inflation factor, the jury apparently disregarded this testimony and rounded off his discounted figure to the nearest thousand in fixing the loss at $67,000. Again, this award must be adjusted to actual income. Because her actual income was $160 and not $200, the amount used by Wolfson as a base, we reduce the award for loss of future wages to 80% (a reduction of $13,400): $67,000 × .80 = $53,600.
Finally, we consider the award of $232,000 for past and future medical expenses. As the litigants stipulated plaintiff's medical expenses to date of trial were $23,521.73, the award for future medical expenses was, in round figures, $208,000. Dr. Jensen, who was accepted by the trial court *116 as an expert in both psychiatry and neurology, testified plaintiff would require outpatient psychiatric care at a cost of $200 per month for the remainder of her life. In addition, she will need medical help, particularly because of a chronic back problem which resulted from a fall during a blackout spell. He was of the further opinion that plaintiff will require future hospitalizations, both medical and psychiatric, each of which could cost several thousands of dollars. Plaintiff has a 26 year life expectancy.
As the record does not contain any evidence which effectively contradicts the above, we cannot conclude the jury abused its discretion in its award for future medical expenses.
For the reasons assigned, the judgment appealed from is amended to reduce the total award from $485,000.00 to $465,240.00. As thus amended, and in all other respects, the judgment is affirmed. Plaintiff-appellee is to pay the costs of this appeal.
AMENDED AND AFFIRMED.
NOTES
[1] Plaintiff's cause of action arose prior to passage of Louisiana Acts 1976, No. 147, § 1, which amended R.S. 23:1032 to restrict executive officer liability to intentional torts.
[2] United States Fidelity and Guaranty Company, also the workmen's compensation insurer, filed a petition of intervention to recover benefits paid from the judgment in plaintiff's favor. Accordingly, judgment was rendered awarding intervenor $36,911.73.