447 So.2d 1184 (1984)
Danny BREWINGTON, Plaintiff-Appellant,
v.
LOUISIANA DEPARTMENT OF CORRECTIONS, Defendant-Appellee.
No. 83-632.
Court of Appeal of Louisiana, Third Circuit.
March 7, 1984.
Writ Denied April 23, 1984.
*1185 Baggett, Mc Call & Ranier, Drew Ranier, Cameron, for plaintiff-appellant.
Houston T. Penn, Asst. Atty. Gen., Dept. of Justice, Baton Rouge, for defendant-appellee.
Before FORET, DOUCET and YELVERTON, JJ.
DOUCET, Judge.
Plaintiff, Danny Brewington, an inmate at the Louisiana Correctional and Industrial School located at DeQuincy, La., brought the present damage suit for injuries he received when scalded by hot water in the course of repairing a washing machine. The trial court found he assumed the risk of injury and dismissed his demands against the Louisiana Department of Corrections, defendant-appellee. Plaintiff appeals.
Plaintiff relies on two general legal principles. First, the Department of Corrections can be held liable to an inmate who is negligently injured by another inmate. Turner v. State, 333 So.2d 310 (La.App. 1st Cir.1976); Darville v. Associated Indemnity Corp., 323 So.2d 441 (La.1975). Secondly, the Department of Corrections is under a duty to provide inmates with a reasonably safe place to work and with equipment that is reasonably safe for performing required tasks. Reed v. Department of Corrections, 351 So.2d 788 (La.App. 1st Cir. 1977).[1]
In his appeal the plaintiff specifies the following assignments of error: (1) The trial court erred in holding the plaintiff contributorily negligent insofar as it relied on Bridgewater v. State, 422 So.2d 1214 (La.App. 1st Cir.1982), which was reversed by the Louisiana Supreme Court, 434 So.2d 383 (La.1983); (2) The trial court erred in not finding the Department of Corrections *1186 liable for the negligence of the inmate who discharged the hot water which resulted in plaintiff's injuries; (3) The trial court erred in failing to find the defendant liable for failure to supervise; and (4) The trial court erred in finding the plaintiff assumed the risk and therefore was contributorily negligent.[2]
The summation of facts and legal conclusions of the trial judge are as follows:
"Plaintiff Danny Brewington sues for damages for personal injuries sustained by him in an accident that occurred on May 5, 1978, while he was an inmate at Louisiana Correctional and Industrial School near DeQuincy, which is operated by defendant Louisiana Department of Corrections. At the time of the accident Brewington was assisting another inmate with repairs to a washing machine located in the laundry room at LCIS. He crawled into a drainage trough under the washing machine and was burned by hot water released into the trough by another nearby washing machine.
Plaintiff contends that the defendant was negligent in failing to provide him with a safe place to work and in failing to provide proper supervision of his work. Defendant denies any negligence on its part and contends that the accident was caused solely by the negligence of Brewington in voluntarily placing himself in the drainage trough when he had not been directed to do so and when it was not necessary for him to get into the trough. Alternatively, defendant contends that plaintiff is barred from recovery by contributory negligence and/or assumption of risk.
The washing machine that Brewington was working on at the time of the accident had been leaking steam and needed repair. To make the repairs it was necessary to remove from the underside of the machine a metal plate which served as a junction for a steam pipe which heated the water in the machine. The head of the laundry department, a Mr. Lucius, requested that the machine be repaired and that job was assigned to William Wardlow, who was an inmate plumber in the plumbing shop at LCIS. Later Brewington, who worked in general maintenance under the maintenance superintendent, Mr. Rainwater, was assigned to assist Wardlow.
Plaintiff was thirty-two years of age at the time of the accident and he had been an inmate at LCIS since 1971. He is serving a life sentence and he was still incarcerated at the time of the trial. Between 1971 and the date of the accident Brewington had worked at various jobs at LCIS, including plumbing and maintenance work. He was in the plumbing shop for approximately three years under the supervision of Mr. Rainwater, who was then the plumbing supervisor and who at the time of the accident was the overall maintenance superintendent. When the accident occurred on May 5, 1978, Brewington was assigned to the general maintenance department under the direct supervision of Mr. Rainwater. Brewington and Mr. Rainwater had a good relationship and seemingly had a high regard for each other. Mr. Rainwater said Brewington was a good man who could be depended upon. He said, and Brewington confirmed, that plaintiff could and would approach him with a problem.
Brewington had done some plumbing and general maintenance work in the laundry room and he knew about the trough under the washing machine and he knew that the trough was there to receive and drain off the hot water released from the machines.
*1187 Between 8:00 and 9:00 o'clock A.M. on the day of the accident, and after being told by Mr. Rainwater to assist Wardlow, Brewington went to the laundry room and found Wardlow on the floor at the back of the washer attempting to remove the metal plate. At that time the laundry was in full operation and the plate was taken off without either Wardlow or Brewington getting into the trough under the machine. While the plate was being removed by Brewington and Wardlow a nearby washing machine was in use and hot water had been released into the trough without causing any problems for the two men. This was verified by Mr. Lucius, the head of the laundry department, who said he had seen Wardlow and Brewington working with the plate on the washing machine at times when hot water was dumped from the other machine. Mr. Lucius said he saw both Wardlow and Brewington on the floor reaching under the machine, but he never saw either of them in the trough.
After the plate was removed it was taken to Mr. Rainwater at the shop and he did some welding work on it. In the early afternoon of that day Wardlow returned to the laundry with the plate to attach it to the washing machine. In attempting to replace the plate Wardlow got on the floor and reached under the machine from the front and also from the rear.
Mr. Rainwater learned that Wardlow needed some assistance in attaching the plate to the machine and he again sent Brewington to help. Brewington went to the laundry and found Wardlow on the floor at the rear of the machine trying without success to attach the plate. After a while Wardlow got off the floor and Brewington got on his back on the floor at the rear of the machine. While in that position he held the plate against the machine while Wardlow, who had gone to the front of the washer, was trying to put the bolts through the plate. They had difficulty getting the bolts through the holes in the plate. Brewington told Wardlow the only way the plate could be attached was for him (Brewington) to get into the trough and hold the plate in position. Brewington said he planned to contact Mr. Rainwater about the problem if they could not get the plate on the machine after he got into the trough.
After deciding to get into the trough, Brewington went around to the front of the machine, slid himself under it and down into the trough with his feet in the direction of the other nearby washing machine. The bottom of the machine was 15 to 18 inches above the surface of the concrete floor and the trough at that point was between 17 and 18 inches wide and at least 9½ inches deep. When Brewington got under the machine in the trough Wardlow went to the rear of the machine. After Brewington had been in the trough for at least five minutes (by his estimation) and perhaps as much as twenty minutes (according to Wardlow) hot water was released from the nearby washing machine into the trough and it ran down the sloping trough and scalded Brewington's legs before he could remove himself.
There are photographs in evidence that show where and how the two washing machines were situated in the laundry room and the location of the drainage trough under the old American Cascade machine that was being repaired. The newer machine was situated only three to four feet to the right of the old machine and the control switches for that machine were on a door opposite the right end of the old unit.
According to the evidence, it takes three to four minutes for the new machine to fill up with water and then it takes approximately twelve minutes to go through the hot water washing cycle. When that cycle is completed the next step is to release the hot water from the machine into the drainage trough. During the time the machine is filling up with hot water and going through the washing cycle, all of which requires approximately fifteen or sixteen minutes, there is noise being made that indicates the machine is in operation.
Brewington testified that when he went to the laundry to help Wardlow put the *1188 plate on the American Cascade machine he believed the laundry was shut down because Mr. Rainwater had told him that and he saw nothing going on in the laundry and no one there except Wardlow. He said he never saw or heard anything to indicate to him that the new machine was being used to wash clothes while the old machine was being repaired. Wardlow said that when he went into the laundry to put the plate on the machine there were inmates working there, pressing clothes and doing other things, but he was not aware that anyone was washing clothes in the new machine.
Mr. Rainwater denied he told Brewington the laundry was shut down that day. Further, Mr. Lucius, the laundry supervisor, said the laundry was in full operation that day except for the machine that was being repaired. The Court accepts the testimony of Mr. Rainwater and Mr. Lucius and finds that the laundry was in operation and work was going on there on the day of and at the time of the accident.
Mr. Parker was the plumbing supervisor at LCIS in May 1978. However, he was ill on the day of the accident and was not at work. He testified he was very familiar with the washing machine that was being repaired and he knew the metal plate could be put on and taken off from the back of the machine without getting in the drainage trough. Mr. Parker said taking the plate off and putting it on was a fairly simple job for two men.
Mr. Rainwater, the maintenance superintendent, who was over the plumbing, electrical, paint, carpenter and mechanics shops, said the policy at LCIS did not require a supervisor to be present when a simple job was being performed by inmate workers. Rainwater, Parker and Lucius all agreed it was not necessary to shut down all the equipment in the laundry and stop all work in order to remove and replace the plate on the old washing machine.
The Department of Corrections is under a duty to provide inmates with a reasonably safe place to work and with equipment that is reasonably safe for performing required tasks. See Bridgewater v. State, 422 So.2d 1214 (La.App. 1st Cir. 1982) and Reed v. State, Department of Corrections, 351 So.2d 788 (La.App. 1st Cir.1977). However, the Department is not the insurer of the safety of inmates in prisons. It cannot supervise each inmate in the performance of each task assigned to him. Its duty is to exercise reasonable care to protect an inmate against unreasonable risk of foreseeable harm. It is not required to anticipate and warn against every possible danger to which an inmate may be exposed. See Lanieux v. State, 328 So.2d 765 (La.App. 1st Cir.1976)..."
The trial judge concluded that the plaintiff failed to establish that he was injured because of the defendant's failure to provide him with a safe place or adequately supervise his work. Furthermore, the trial court held the defendant was not liable under the doctrine of respondeat superior for the action of inmate Sam Jones, who was operating the new washing machine which discharged the hot water, in failing to warn plaintiff of the danger, finding plaintiff failed to prove Jones knew or should have known he was in the trough repairing the adjacent machine. It should be noted that the testimony of Jones was not available inasmuch as he had been released prior to trial and efforts to locate him proved unsuccessful. Lastly, the trial judge opined that even if defendant had breached a legal duty owed to plaintiff, Brewington could not recover because he left a position of safety and placed himself in a position of known danger thereby assuming the risk of injury. In reaching this result the trial judge noted that plaintiff "volunteered" to get into the trough and he should have known the adjacent machine was in operation.
Subsequent to the trial judge's ruling, a unanimous Louisiana Supreme Court issued the following pronouncements in Bridgewater v. State, 434 So.2d 383 (La. June 27, 1983), wherein it stated: "It is well established that an employer has an obligation to provide his employees with a working place and conditions which are reasonably safe considering the nature of the *1189 work. La.R.S. 23:13, Lytell v. Hushfield, 408 So.2d 1344 (La.1982); Chaney v. Brupbacher, 242 So.2d 627 (La.App. 4th Cir. 1970); Walker v. Graham, 343 So.2d 1171 (La.App. 3rd Cir.1977), writ refused 346 So.2d 213-14 (La.1977). The Department of Corrections owes prison inmates the duty of providing equipment and machinery which is safe for the tasks the inmates are required to perform. Reed v. State Through the Department of Corrections, 351 So.2d 788 (La.App. 1st Cir.1977)."
In Bridgewater, the safety device on a shearer had been removed and had never been replaced. Also plaintiff's operation of the dangerous machine was not under the supervision of a prison official. If the guard had not been removed or had it been replaced, the accidental injury could not have occurred. The accident was reasonably foreseeable since inmates were using the machine, unusually dangerous because of the absence of the safety device. The risk involved was held to be within the scope of the duty owed by the defendant to the inmates. There existed an ease of association between the risk presented by defendant's actions under the overall circumstances and plaintiff's resulting injuries.
The court therein disagreed with the court of appeal finding that plaintiff was contributorily negligent and that such contributory negligence was a proximate cause of his injuries stating: "Contributory negligence is defined as plaintiff's conduct which falls below the standard of care to which he should perform for his own protection. The standard is determined by reasonableness of behavior under the circumstances. The party relying upon the contributory negligence defense has the burden of proving it. Smolinski v. Taulli, 276 So.2d 286 (La.1973). See also: Hall v. Hartford Accident and Indemnity Company, 278 So.2d 795 (La.App. 4th Cir.1973), writ refused 281 So.2d 753 (La.1973). Contributory negligence is a matter of fact to be determined in light of the circumstances of each case. Soileau v. South Central Bell Telephone Company, 406 So.2d 182 (La.1981). Contributory negligence is never presumed; such negligence on the part of the plaintiff must be proved as any other fact by a preponderance of the evidence. Tirante v. Gulf States Utilities Company, 412 So.2d 128 (La.App. 1st Cir. 1982), writ denied 414 So.2d 389 (La.1982). See also: McInnis v. Fireman's Fund Insurance Company, 322 So.2d 155 (La. 1975). In the case of an inmate plaintiff, the State has the burden of proving that the prisoner had failed to exercise care commensurate with the hazard he faced. Lee v. State Through the Department of Institutions, 294 So.2d 553 (La.App. 1st Cir.1974). We find that the State did not carry its burden in this case."
"Louisiana courts have acknowledged that an employee is not entirely free to avoid known risks; he cannot simply decide not to do the work without perhaps subjecting himself to loss of his job. Chaney, supra. The standard for contributory negligence on the part of an employee was enunciated in Miller v. Employers Liability Insurance Company of Wisconsin, 349 So.2d 1353, 1362 (La.App. 2nd Cir.1977), writ denied 352 So.2d 235 (La.1977):
Emerging as criteria for determining an employee's contributory negligence are: (1) relative knowledge of the danger by the supervising employee and the injured employee; (2) relative control over the employee's situation; (3) the degree to which the employee's conduct is voluntary on his part; (4) alternatives available to the employee; (5) obviousness of the danger; and (6) relative ability to eliminate the danger.
"(T)he standard of care imposed on the workman is less stringent than in ordinary cases where contributory negligence is at issue because the employee at times must involve himself in known hazardous endeavors in order to retain his employment." Martinez v. U.S. Fidelity and Guaranty, 412 So.2d 109, 112 (La.App. 4th Cir.1982), amended and affirmed 423 So.2d 1088 (La. 1982)..."
"... An inmate, in particular, is not in a position to refuse to perform a job known *1190 to be dangerous. See Stilley v. State, 376 So.2d 1007 (La.App. 1st Cir.1979), writ refused 378 So.2d 1389 (La.1980). An inmate has far less freedom of choice; he is subject to disciplinary measures if he refuses to do what he is told..."
Although the trial judge carefully considered all the evidence, as reflected in his thorough written reasons for judgment, it appears that he fell into error in his application of the law to the facts in view of the Supreme Court's pronouncements in Bridgewater, supra. Where factual determinations by a trier of fact are based upon incorrect application of the law, the manifest error rule does not apply. Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707 (La.1980); Burns v. Lamar-Lane Chevrolet, Inc., 354 So.2d 620 (La.App. 1st Cir.1977); Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975).
Whether an inmate voluntarily assumes any risk relative to an assigned duty is highly questionable in view of his incarceration. Thus it has been stated that a prison inmate assumes no risk of his employment. 60 Am.Jur.2d 837. Such a worker is not free to quit or determine his training, education, hours, and duties as an ordinary worker in a free society. Consequently, in the case of an inmate plaintiff, the state has the burden of proving that the prisoner had failed to exercise care commensurate with the hazard he faced to establish contributory negligence. Bridgewater v. State, supra. Another consequence of one's incarceration is that their damages will likely be limited to pain and suffering at least where, as here, the plaintiff is serving a life sentence and, accordingly, all needs are provided at no expense to him.
The Department of Corrections uses the trough in which plaintiff was scalded to make it easier to clean the drainage system, rather than provide enclosed sewer pipes or troughs with covers which are harder to clean. Therefore, it appears the Department creates the risk because it considers it to be outweighed by the utility of the open drain. The foreseeable risk of injury to an inmate assigned to repair the machine created a corresponding duty to warn or otherwise take precautions to protect the worker. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972).
LSA R.S. 15:832 provides:
"Section 832. Work by inmates; allowances: A. The department shall provide employment opportunities and vocational training for all inmates. Insofar as is possible, the equipment used in such programs, the conditions of employment, the management practices and the general operating procedures thereof, shall proximate those of private industry..."
George Liebkemann, who was accepted by the Court as an expert witness in mechanical engineering, testified as follows:
"A: First of all, its accepted in industry and has been accepted as long as I have been dealing professionally with machinery and equipment some twenty odd years that when its necessary for a maintenance man to place himself in, under or extremely close to potentially hazardous equipment in order to do maintenance, and that could include placing himself where hot or toxic substances could, without warning be dumped on him, removing a guard to reach into a machinery housing or something like that, that all the equipment in that area capable of suddenly starting up or cycling and resulting in bodily injury and harm to the maintenance man, should be completely deactivated and locked out, not just turned off, but rendered incapable of a situation where a guy that doesn't know what's going on comes up and innocently tries to start something, not realizing that a man is in the machine or under the machine."
Mr. Liebkemann further stated:
"A. I found provision at the institute for that. There's an electric circuit breaker box on the wall. The box comes from the Square D Manufacturing Company with provision on the box to padlock the electric handle in the off position, that being a safety feature. So, *1191 this is a case where the Pellegrin Millder machine with the hot water could have been empty, the main switch to it turned off, and then either the fuses removed so somebody couldn't turn it on, or the handle padlocked in the off position."
As to the problems created by Brewington's arriving late on the job after the operation had been in progress for some time, expert testimony was as follows:
"Q: And it is also your opinion based on your experience that when a person joins a job after it has been begun, that the responsibility for insuring that there's been a lock-out is much, much less than it would be if he were the first worker on the scene?"
"A: Yes. When somebody joins a job, if the procedure is going right and it is already locked out when he joins. There are a lot of jobs where people come and go and all that, and the custom is to lock it out so anybody that does anything, render it safe, and then proceed with the work and from time to time, the work may take one man and then three men, and then five men, depending on what's going on, but the first thing that's done is to render itrender the equipment harmless to the workers."
"A: There's an unusual circumstance here, where Mr. Brewington was not present or anywhere around here when the work started on this job. Mr. Wardlow started the job. He had trouble, and as a result, Mr. Brewington arrived while the job was in progress. So, he wasn't really there at the time that you would normally shut off the other equipment."
There was also testimony that because of the machine being placed directly over the trough, any work under the machine must necessarily place the maintenance man in proximity of danger of scalding. There is also the discussion regarding the necessity of being under the machine to replace the plate. The difficulty of the task is lining up all ten bolts which hang loosely from the drum with ten holes in the plate. Therefore, it was necessary for someone to be in close proximity or in the trough in order to get the plate back on, and a dangerous situation had been created if the washing machine were not drained and locked out.
Mr. Lucius, the laundry supervisor, who asked that the work was done, knew that it was being done, and knew that the men were working under the machine and he had the authority to shut off the adjacent machine. Mr. Lucius also knew that if any part of anyone got in the trough, for whatever reason, the worker would be scalded by water from the adjacent machine, nevertheless he failed to take easily available precautions.
Under the above facts we find that the Department breached its duty to provide a safe work place or otherwise take supervisory or precautionary measures to protect against the risk posed. Bridgewater v. State, supra. Accordingly, we proceed to determine whether plaintiff's conduct bars his recovery.
Brewington knew that it would be dangerous if hot water were discharged in the trough while a person was working in it. Because of that knowledge, he would not have worked in it had he thought the other machine was operating. The question then is, was it reasonable for him to think that it was not operating? The following factors suggest that it was: The laundry was deserted; it had been cleaned for the day by the time Brewington got there; and the laundry supervisor was absent. Also, plumbing and maintenance supervisors were absent. The job had begun and was in progress when Brewington arrived and no warnings or instructions were issued by fellow inmates or supervisors regarding its operation.
The only eye witness, Mr. William Wardlow, the inmate who was assigned plumbing duties and to whom the plaintiff had been sent to assist in replacing the plate on the washing machine, testified as follows:
"Q: You indicated at one point that you volunteered to get into the trough?
A: Yes, sir.

*1192 Q: Was it your understanding that the laundry was shut down, that all the washing machines were shut down?
A: That was to my understanding, `cause I would have never volunteered to get into the trough myself.
Q: At any time that you had been working in the laundry, either before or after Danny Brewington had arrived, did you see anybody operate either of the two machines?
A: No, sir."
Mr. Wardlow also testified as to how the accident occurred:
"A: ... so he climbs up in there and he's trying to look up under to get the holes and the screws, you know, where they drop inkind of checking things out, you know, and he was off in the trough and I still remember the guy's face that pulled the plug on him, you know, and the water came down him and he started screaming. So I just froze for a minute, you know, and then I run around and tried to pull him out. I pulled him out and he was hollering `Get my pants off of me.' So I pulled his pants off of him and the meat was just rolling down his legs, you know."
In Coco v. Winston Industries, 330 So.2d 649 (La.App. 3rd Cir.1976) reversed on other grounds 341 So.2d 332 (La.1977), we held that an injured worker, doing a job he was assigned to do, and attempting to do it in the best manner he knew how, should not be held contributorily negligent, noting that "The presumption is that one does not intentionally expose himself to a known danger." i.d.
In Stilley v. State, supra, the plaintiff prisoner was injured while repairing a heavy truck tire when the tire exploded. The court held that the plaintiff was entitled to recover damages "primarily because the plaintiff, as an inmate, was not in a position to refuse to perform a job known to be dangerous." 376 So.2d 1008. This is legal recognition of the reality of prison life, namely, the prisoner's restriction of freedom and subjection to close supervision and discipline require obedience to, rather than questioning of, orders and assignments, and a commensurate high degree of care from those giving the orders, assignments and instructions.
Our review of the record convinces us that plaintiff was doing his work in the best manner he knew how and said action was reasonable under all the circumstances. We find that the defendant did not carry its burden of proving the inmate failed to exercise care commensurate with the hazard he faced.
Plaintiff was 32 years old at the time of the accident. He sustained at least second degree burns, and according to the hospital records, some third degree burns, to 95% and 55%, respectively, of his lower extremities below the knees. The hospital records reflect numerous surgical and non-surgical debridement procedures, a necessary but extremely painful part of treatment of burn patients. We find that an award of $25,000.00 for past, present and future pain, disfigurement and suffering would be just to the litigants.
For the reasons assigned hereinabove, the judgment appealed is reversed. It is now ORDERED, ADJUDGED AND DECREED that there be a judgment in favor of plaintiff in the sum of Twenty-Five Thousand and no/100 ($25,000.00) Dollars. All costs of this appeal are assessed against the defendant.
REVERSED AND RENDERED.
NOTES
[1] Note: Louisiana Workmen's Compensation Act is not applicable. Jones v. Houston Fire and Casualty Co., 134 So.2d 377 (La.App. 3rd Cir. 1961).
[2] Appellee attempts to raise two assignments of error, to wit: (1) The trial court erred in ruling that the affidavit of Sam Jones, an inmate witness released prior to trial, was inadmissible where it was the best evidence available in view of the inability to locate Jones; and (2) The trial court erred in its assessment of appellee's expert witness fees insofar as it was based on plaintiff's ability to pay rather than reasonableness of the fee. However, an appellee who believes himself aggrieved by a judgment in his favor, in order to place himself in a position to ask for amendment thereof, must expressly answer the appeal in written motion, and to ask for such relief in brief is unavailing. La.C.Civ.Pro. Art. 2133; Moore v. Natchitoches Coca Cola Bottling Co., 32 So.2d 347 (La.App. 2nd Cir.1947); Juan v. Harris, 263 So.2d 370 (La.App. 4th Cir.1972).