STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

10-1163


TTV, L.L.C.

VERSUS

DAVID B. SIMMONS


************

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-2007-5954
HONORABLE EDWARD BROUSSARD, DISTRICT JUDGE

************

JIMMIE C. PETERS
JUDGE

************

Court composed of John D. Saunders, Oswald A. Decuir, and Jimmie C. Peters, Judges.


**AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.**



**Lamont P. Domingue**
**Voorhies & Labbe**
**P. O. Box 3527**
**Lafayette, LA 70502**
**(337) 232-9700**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
      **TTV, L.L.C.**

**David A. Lowe**
**Keegan, Denicola, Kiesel,**
**Bagwell, Juban & Lowe, LLC**
**5555 Hilton Avenue**
**Suite 205**
**Baton Rouge, LA 70808**
**(225) 364-3600**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
  **David B. Simmons**
  **Wrightwood Construction, L.L.C.**

PETERS, J.

TTV, L.L.C. (TTV), a Louisiana limited liability company, brought suit against David B. Simmons and Wrightwood Construction, L.L.C. (Wrightwood Construction), another Louisiana limited liability company, to recover certain funds it had paid to the defendants pursuant to a services and construction agreement entered into by the litigants. TTV appeals the trial court judgment rejecting its claims. For the following reasons, we affirm the trial court's rejection of TTV's claims against Wrightwood Construction but reverse the trial court's rejection of its claims against Mr. Simmons and render judgment in favor of TTV and against Mr. Simmons in the amount of $112,421.00.

## DISCUSSION OF THE RECORD

In September of 2004, TTV acquired a thirty-year old apartment complex in Baton Rouge, Louisiana. In the Spring of 2007, Glenn Stewart, TTV's principal owner and general manager, was involved in building a new apartment complex in Lafayette, Louisiana. The contractor in the Lafayette project was Julian LeCraw Construction Company (LeCraw Construction), and David B. Simmons was LeCraw Construction's project manager for the Lafayette project. During this time TTV decided to renovate the Baton Rouge apartment complex and convert it into a facility to be known as Tiger Manor Condominiums.

In the Spring of 2007, and before any renovation and remolding activity was performed on the Baton Rouge property, Mr. Stewart approached LeCraw Construction's president, Steven Hendricks, and offered his company the opportunity of performing the work on the Tiger Manor project. Mr. Hendricks declined the opportunity, but offered to loan Mr. Simmons to TTV as a consultant on the Tiger Manor project. However, the loan of Mr. Simmons' services was to be limited to the

time he was not involved in activities for LeCraw Construction. In fact, LeCraw Construction continued to pay Mr. Simmons' salary through August 28, 2007, and billed TTV $4,550.00 for Mr. Simmons' consulting services between May 18 and July 18, 2007.[1]

With nothing more than an understanding that LeCraw Construction was loaning Mr. Stewart to TTV as a consultant, Mr. Stewart and Mr. Simmons began working together in earnest in June of 2007. At that point, they were involved in choosing floor finishes, deciding on cabinet options, establishing budgets for the remodeling projects, and acquiring permits. TTV's initial goal was to quickly complete two model units at Tiger Manor for use in promoting sales and rentals.

The first direct reference to funding of the Tiger Manor project found in the record is a June 11, 2007 e-mail from Mr. Simmons to Mr. Stewart wherein he noted that "[w]e will also need to arrange for some funding this week so I can keep things moving." Three days later, on June 14, 2007, Mr. Stewart issued Mr. Simmons a $25,000.00 check. This was followed by two additional $25,000.00 checks from Mr. Stewart to Mr. Simmons—one issued on June 20, 2007, and the other on June 27, 2007. On July 12, 2007, Mr. Stewart issued a $50,000.00 check to Mr. Simmons.[2]

Six days after receiving the last check, on July 18, 2007, Mr. Simmons e-mailed Mr. Stewart a detailed budget for the entire renovation project. The bottom line of that budget reflected a projected cost of construction of $6,827,966.00. The cover letter attached to the transmitted budget discussed some possible changes and

---

[1]This represented seven days of consulting services at $650.00 per day.

[2]At trial Mr. Stewart testified that TTV reimbursed him for the $125,000.00 he spent on its behalf.

raised questions concerning certain categories before closing with the following

discussion of the startup costs:

> Here is a basic breakdown on the money paid to date . . . . .
> I will have a very detailed one put together for you when you return ...
> There are two bid deposits that need to go out while you are gone to keep the granite and windows moving . . . .
> Mobilization 25K
> Permits 25K
> License 28K
> General Conditions 50K
> Model Units (2) 44K
> Next 10 units @ 25% 50K
> Deposits
> > Granite 40K
> > Windows 75K
> Total 337K
> Paid 125K
> Balance 212K
> Let me know if you need the account number to transfer funds or you can leave a check with someone and I will have it picked up which ever is easier for you . . . . . Just let me know

As the e-mail reflects, Mr. Simmons drew no distinction between what had been paid

by the $125,000.00 he had received and what was to be paid. At best, the e-mail

purports to establish the estimated costs for the completion of the two model units and

the first ten units thereafter.

The first reference to Wrightwood Construction comes in a July 27, 2007 e-

mail sent by Mr. Simmons to Mr. Stewart wherein he sent a second copy of the cover

letter to the proposed budget and stated:

> This is a copy of the email I sent to you before you left on the money status....
> Like I told you if you want to wait on the deposits that is fine but need the other to keep things moving ...
> You can make this and all future payments to Wrightwood Construction, LLC. I can have the check picked up in Lafayette or it can be delivered to Baton Rouge and given to Sam [the on-site manager]. I will be back on site Sunday and most of next week ....
> Just let me know....

That same day Mr. Simmons sent Mr. Stewart another e-mail that stated:

> We have the permits for the model units ....
> The others should follow very soon....
> I have everyone scheduled to put the models together the correct way....
> Plumber is working this weekend and the Electrician will be there in force on Monday...
> I will push everyone as much as possible so we can have these completed as soon as possible.  Hopefully early week of the 6ᵗʰ...

Apparently in response to these e-mails, TTV issued a check made payable to Wrightwood Construction for $212,000.00 on July 30, 2007.

In the meantime, the project continued to move forward.  According to Mr. Stewart, by the end of July 2007, he had worked with an architect to help TTV obtain its building permits; had hired everyone working on the site; had helped select all of the options for the condominiums, including kitchen appliances, finishes, and lighting packages; had overseen the demolition work on forty-five of the preexisting units; and had almost completed the two model units.

The two model units were completed some time around the first week in August of 2007. On August 20, 2007, Mr. Stewart e-mailed Mr. Simmons reporting that the open house involving the two model units had been well received.  In the e-mail, he thanked Mr. Simmons for his "hard work," and noted that Mr. Simmons had "certainly delivered as [he had] promised!"  The following day, August 21, 2007, Mr. Simmons e-mailed Mr. Stewart concerning the plans to paint the buildings and install shutters and windows, as well as plans for clubhouses, playgrounds, and a basketball court.  The next week was Mr. Simmons' last day on LeCraw Construction's payroll.

Despite the fact that Mr. Simmons had begun to work full-time with and/or for TTV, the parties still had no written agreement.  However, the new relationship had a short life.  In mid-September relations between Mr. Stewart and Mr. Simmons

4

began to deteriorate because Mr. Simmons ignored Mr. Stewart's repeated e-mail efforts to obtain an accounting of the money already paid to Mr. Simmons and Wrightwood Construction—and to get a response to his dissatisfaction with the progress of the project.

On September 26, 2007, TTV took steps to terminate its relationship with Mr. Simmons and Wrightwood Construction. Mr. Stewart had the locks changed at the project office and secured the contents thereof. According to Mr. Stewart, between the time the two models were completed and September 26, 2007, essentially no work was performed at Tiger Manor.

TTV filed suit against Mr. Simmons and Wrightwood Construction on November 5, 2007, alleging that the defendants had improperly diverted the $337,000.00 it had disbursed between June 14 and August 3, 2007, to Mr. Simmons' personal use. Mr. Simmons and Wrightwood Construction answered the suit and reconvened for damages for breach of contract, unjust enrichment, quantum meruit, and defamation.

With this factual background, the trial court was required to determine the nature of the agreement or agreements among the parties to the litigation and to trace the $337,000.00 at issue. With regard to the first issue, the only uncontested part of that determination was that LeCraw Construction loaned Mr. Simmons' services to TTV with the understanding that LeCraw Construction would continue to pay Mr. Simmons.

With regard to the relationships among the parties, Mr. Stewart testified that initially he expected Mr. Simmons to be a consultant and facilitator who would help TTV obtain its permits, select a general contractor, and provide advice on how to

convert the thirty-year-old apartment buildings into condominiums. According to Mr. Stewart, these services were to be performed by Mr. Simmons without compensation because he [Mr. Simmons] was on loan from LeCraw Contractors and was being paid by that entity for the very services for which Mr. Simmons now seeks compensation. When the Tiger Manor project began, Mr. Stewart did not anticipate that Mr. Simmons would be a candidate for the general contractor position, but he testified that as early as June 3, 2007, he realized that Mr. Simmons "wanted to take over the whole project and be the general contractor and do everything. And he explicitly made that clear to me when he went over the June 15th budget." According to Mr. Stewart, the terms of the proposed budget reflected a profit margin for the general contractor of $500.00 per unit for each of the 300 projected units, or a maximum of $150,000.00. Mr. Stewart testified that his understanding early in June of 2007 was that Mr. Simmons would form a construction company, obtain his contractor's license, and undertake the remodeling project for the contemplated profit of $500.00 per unit.

Mr. Simmons, on the other hand, testified that the $500.00 per unit profit, totaling $150,000.00, was to compensate him for his consulting activities in setting up the project. According to Mr. Simmons, he had earned his $150,000.00 consulting fee when the two model units were completed. When the original general contractor did not work out, he formed his own construction company and, only then did he become the general contractor for that job. In other words, Mr. Simmons argues that there were actually two different agreements with TTV—the first was a personal one for his consultant services that he completed and for which he was entitled to the agreed-upon compensation of $150,000.00; and the second was between TTV and

Wrightwood Construction for which he and/or Wrightwood Construction were entitled to a separate compensation.[3]

The trial court rendered judgment rejecting both the original claim and the reconventional demand and effectively left the parties in a status quo situation. In its written reasons for judgment, the trial court stated in pertinent part:

> The evidence fails to sustain plaintiff's burden of proof that any funds were misappropriated. No builders or suppliers testified that any funds were due them. As stated in defendants[sic] post-trial memorandum, "plaintiff failed to produce one single invoice or bill that it had to pay because Simmons and/or Wrightwood failed to pay it." The plaintiff's claim for damages is denied.

> Defendants were terminated prior to the project being finished. They were to have been paid One Hundred Fifty Thousand Dollars ($150,000.00), collectively, for their work. They received One Hundred Twenty-Five Thousand Dollars ($125,000.00). This court cannot say that they were either underpaid or overpaid. Defendants may retain the portion of the fee collected, but will not be granted the additional Twenty-Five Thousand Dollars ($25,000.00) because the project was not finished at the time of their termination.

In its five assignments of error, TTV basically raises one issue: whether the trial court erred in rejecting its claims for conversion, breach of contract, fraud, breach of fiduciary duty, and intentional interference with a contract because TTV failed to produce evidence of unpaid builders or suppliers.

**OPINION**

TTV did not appeal the portion of the trial court judgment finding that the agreement between Mr. Simmons and Mr. Stewart provided for Mr. Simmons and/or Wrightwood Construction to be paid a total of $150,000.00 for their role in the Tiger Manor project, nor did it appeal the $125,000.00 partial award for that role. However, the trial court's reasons for judgment implicitly reject Mr. Simmons'

---

[3]Mr. Simmons never testified concerning what he understood his compensation to be as general contractor.

assertion that he was to be paid $150,000.00 for services rendered as a consultant setting up the project and that Wrightwood Construction was to be paid another, unspecified, fee for its work during the renovation and construction phase. While the correctness of this determination plays only a peripheral part in our analysis and is not directly before us on appeal, we do note that this determination is supported by the record—particularly the July 18, 2007 e-mail wherein the cover letter made no mention of the purported $150,000.00 consultant fee. In fact, the only reference in that document to the margin of profit is in the budget, which provides for a $500.00 payment for each of the 300 units completed. Additionally, it is not disputed that Mr. Simmons began his involvement with the Tiger Manor project as a loaned employee from LeCraw Construction or that his employer had continued to pay his normal salary while he was working on the Lafayette, Louisiana, TTV project and had billed TTV for what it understood to be Mr. Simmons' efforts in Baton Rouge.

TTV claims the right to recover under six different legal theories, and in each assignment of error asserts that the trial court erred in rejecting its claim based on it failure to produce evidence of unpaid builders or suppliers. We agree.

The issue before the court was whether Mr. Simmons and/or Wrightwood Construction improperly diverted funds placed in their trust to Mr. Simmons and, while TTV may have had to pay expenses associated with the Tiger Manor project that should have been paid with the funds distributed to Mr. Simmons and/or Wrightwood Construction, that is not an element of its proof to establish that Mr. Simmons and/or Wrightwood Construction improperly diverted funds placed in their trust. The trial court erred as a matter of law in requiring TTV to produce evidence of unpaid builders or suppliers. That being the case, and because the record before

8

us is complete, we will consider the merits of the legal theories espoused by TTV under the *de novo* standard of review. *Evans v. Lungrin*, 97-541, 97-577 (La. 2/6/98), 708 So.2d 731.

In performing the *de novo* review of the matter before us, we find it necessary to consider only one of the legal theories—breach of a fiduciary duty. "As a basic proposition, for a fiduciary duty to exist, there must be a fiduciary relationship between the parties." *Scheffler v. Adams and Reese, L.L.P.*, 06-1774, p. 6 (La. 2/22/07), 950 So.2d 641, 647. The Louisiana Uniform Fiduciaries Law, La.R.S. 9:3801-3814, defines a fiduciary as follows:

> "Fiduciary" includes a trustee under any trust, expressed, implied, resulting or constructive, executor, administrator, guardian, conservator, curator, receiver, trustee in bankruptcy, assignee for the benefit of creditors, partner, agent, officer of a corporation, public or private, public officer, or any other persons acting in a fiduciary capacity for any person, trust or estate.

La.R.S. 9:3801(2).

Additionally, a corporation can be a fiduciary. La.R.S. 9:3801(3). As pointed out by the supreme court, "[t]he defining characteristic of a fiduciary relationship, therefore, is the special relationship of confidence or trust imposed by one in another who undertakes to act primarily for the benefit of the principal in a particular endeavor." *Scheffler*, 950 So.2d at 648.

The existence of a "special relationship of confidence or trust" between Mr. Simmons and Mr. Stewart was clearly demonstrated at trial. In his testimony concerning the relationship he created as a consultant for TTV, Mr. Simmons stated:

> He [Mr. Stewart] told me that he needed assistance putting it together. He did not know construction. He knew my background and felt comfortable with my knowledge and felt like I could assist him greatly in putting this project together. And we discussed it and came to an agreement that I would do the set up on the project for him.

9

When describing Mr. Simmons' role in the project, Mr. Stewart stated:

> He [Mr. Simmons] was going to be the general contractor. I mean, he was going to do the whole thing. You know, I didn't know anything about construction really. And he was going to get the permits, get all the subs lined up. I mean, he was running the show.

Even Mr. Simmons' argument in his brief to this court supports the special relationship of trust and confidence, as it stated:

> Specifically, [TTV] told Simmons that he needed help putting the Project because [TTV] had no construction experience. [TTV] discussed this opportunity with him because [TTV] knew Simmons' background, felt comfortable with Simmons' construction knowledge, and felt like Simmons could greatly assist [TTV] in putting the Project together. At that time, Simmons had over thirty (30) years of experience in the construction industry . . . .

[Citations to the record omitted.]

The trust that TTV and Mr. Stewart placed in Mr. Simmons is further evidenced by the fact that the entire relationship regarding the expenditure of the $337,000.00 existed without a written contract and was evidenced by nothing more than a cover letter to an e-mail.

A fiduciary must handle the manner entrusted to him "as though it were his own affair." *Noe v. Roussel*, 310 So.2d 806, 819 (La.1975). The fiduciary "may not take even the slightest advantage, but must zealously, diligently and honestly guard and champion the rights of his principal against all other persons whomsoever, and is bound not to act in antagonism, opposition or conflict with the interest of the principal to even the slightest extent." *Id.* at 819. To establish a cause of action for breach of fiduciary duty, the plaintiff must prove fraud, breach of trust, or some action outside the limits of the fiduciary's duty. *Sampson v. DCI of Alexandria*, 07-671 (La.App. 3 Cir. 10/31/07), 970 So.2d 55. We find that TTV established both of the last two elements.

The record establishes that the $337,000.00 at issue is the exact amount requested by Mr. Simmons in his cover letter to the July 18, 2007 e-mail; that Mr. Stewart, acting on behalf of TTV, paid $125,000.00 of that amount directly to Mr. Simmons before Wrightwood Construction came into existence; and that TTV paid the remaining $212,000.00 to Wrightwood Construction pursuant to Mr. Simmons' instruction. However, because the payments were made to separate entities, they must be considered separately.

The record also establishes that of the initial $125,000.00, which was paid directly to Mr. Simmons, only $12,579.00 was used for the benefit the Tiger Manor project.[4] Additionally, the trial court rejected Mr. Simmons' argument that he was entitled to a separate $150,000.00 consulting fee in addition to his salary from his direct employer. Thus, we find that Mr. Simmons breached his fiduciary duty to TTV by diverting the remaining $112,421.00 directly to his benefit.

The remaining $212,000.00 paid to Wrightwood Construction presents a different situation entirely. This amount arises from the second contract affecting the project. It was not between TTV and Mr. Simmons, but between TTV and Wrightwood Construction, and Wrightwood Construction was to make a profit of $500.00 per unit for every one of the 300 units completed under the contract. Thus, although in its reasons for judgment the trial court seemed to award the previously claimed compensation to both Mr. Simmons and Wrightwood Construction, it is clear that Wrightwood Construction is the proper entity to receive credit for that amount.[5]

_____

[4]Mr. Simmons paid $3,680.00 to Patrick Davis, a contractor working on the project; $3,200.00 to Sandra O'Brian, Mr. Simmons' sister, whom he hired to serve as project manager; and $5,699.00 for cabinets to be installed in the units.

[5]The trial court judgment itself does not mention the $125,000.00 issue. Instead, it simply states that all claims of both David B. Simmons and Wrightwood Construction "against TTV, L.L.C. and Glenn Stewart are denied with prejudice."

11

The record establishes that Wrightwood Construction paid $125,725.64 for the benefit of the Tiger Manor project and paid the remainder, $86,274.36, to Mr. Simmons directly. When proper interpretation is given to trial court reasons for judgment, the amount paid to Mr. Simmons represents part of the $125,000.00 fee.[6] We find that Wrightwood Construction is not indebted to TTV and the trial court did not err in dismissing TTV's claims against Wrightwood Construction.

## DISPOSITION

For the foregoing reasons, we reverse the trial court's judgment to the extent that it dismissed TTV, L.L.C.'s claims against David B. Simmons and award judgment in favor of TTV, L.L.C. and against David B. Simmons, in the amount of $112,421.00. We affirm the trial court's rejection of TTV, L.L.C.'s claims against Wrightwood Construction, L.L.C. We assess all costs of this appeal to David B. Simmons.

**AFFIRMED IN PART, REVERSED IN PART, AND RENDERED**.

---

[6]Wrightwood Construction did not appeal the trial court's failure to award it an additional balancing sum. We note that in their reply brief, the defendants attempt to argue that the trial court erred in denying Mr. Simmons' claims for breach of contract, lien, and defamation. However, neither defendant filed an answer to the appeal, as required under La.Code Civ.P. art. 2133. Filing a brief does not satisfy the article's requirements. *Brewington v. La. Dep't of Corr.*, 447 So.2d 1184 (La.App. 3 Cir. 1984), *writ denied*, 449 So.2d 1348 (La.1984). Accordingly, we do not address those issues.